IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FOOD & WATER WATCH, | |
| Plaintiff, | Civil Action No. |
| v. | |
| SMITHFIELD FOODS, INC., | |
| Defendant. | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446, Defendant Smithfield Foods, Inc. ("Smithfield"), by its undersigned counsel, hereby invokes this Court's jurisdiction and removes the state court action described below from the Superior Court of the District of Columbia, Civil Division, to the United States District Court for the District of Columbia based on two independent grounds: (1) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), and (2) jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). In this notice of removal, Smithfield provides the required "short and plain statement of the grounds for removal." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014). "[A] defendant's notice of removal need only include a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Id.* at 89. That requirement is satisfied here.

## I.   PROCEDURAL HISTORY

1.     On June 16, 2021, Plaintiff Food & Water Watch ("FWW" or "Plaintiff") filed this action in the Superior Court of the District of Columbia, Civil Division, in a case captioned

*Food & Water Watch v. Smithfield Foods, Inc.*, Case No. 2021 CA 002020 B (the "State Court Action").

2.      Smithfield was served with a copy of the Complaint on June 30, 2021. Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the summons, Complaint, all documents filed with the Superior Court of the District of Columbia, and the Superior Court Docket Report are attached as Exhibit A.

3.      Pursuant to 28 U.S.C. § 1446(a), Smithfield will promptly give written notice of this Notice of Removal to FWW and file a copy of the same with the Clerk of the Superior Court of the District of Columbia, Civil Division.

4.      The Complaint alleges violations of the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq*. Specifically, the Complaint alleges that during the early days of the COVID-19 pandemic, in early 2020, Smithfield made misleading statements about "the state of the national meat supply chain and the company's workplace safety practices." Compl. at ¶ 1.

5.      For example, the Complaint claims that Smithfield made misrepresentations in newspaper articles, through social media, and on the internet that "a countrywide meat shortage was imminent" in order to "juic[e] demand and sales" and to create "a false justification to keep its slaughterhouses operating at full tilt[.]" *Id.* at ¶ 4.

6.       Similarly, the Complaint alleges that Smithfield "misrepresented working conditions in its plants" to allay "concerns for worker safety" and to promote Smithfield's "marketing and branding efforts during the pandemic." *Id.* at ¶ 5.

7.      The Complaint alleges that "FWW was injured by Smithfield's conduct" because it "spent considerable time and resources investigating the truth of Smithfield's claims" and

"educat[ing] its members, consumers and the general public" about whether there were meat shortages in 2020 and whether Smithfield was adequately protecting its workers from exposure to COVID-19 at that time. *Id*. at ¶¶ 90-102.

8.      The Complaint further alleges that, because Smithfield's statements are still on the internet and Smithfield has not retracted those statements, FWW will have to spend "additional resources correcting the company's misrepresentations and counteracting the company's claims[.]" *Id.* at ¶¶ 103-05.

9.      The Complaint explicitly identifies no less than nine alleged violations of the CPPA.[1] *See id*. at ¶ 110(a)-(i) ("Smithfield has violated the CPPA by engaging in the following unfair and deceptive trade practices…").

**A.      FWW's Individual Claims and Requests for Relief.**

10.     The Complaint alleges that FWW is a "non-profit organization" within the meaning of D.C. Code § 28-3901(14) and that FWW is bringing an action as a non-profit organization "on behalf of itself" pursuant to D.C. Code §28-3905(k)(1)(C). Compl. ¶¶ 112-13, 117.

11.     The Complaint seeks a declaration that Smithfield's statements violated the CPPA, statutory damages, punitive damages, attorneys' fees, expert fees, and prejudgment interest awarded to FWW ***in its own name***, and injunctive relief, including corrective advertising, intended to prevent ongoing injury to FWW. *Id*. at ¶¶ 114, 117-18 and Prayer for Relief.

---

[1] Smithfield does not concede, and explicitly denies, that FWW is entitled to any relief. But a plaintiff's claim "whether well or ill-founded in fact, fixes the right of the defendant to remove[.]" *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 294 (1938).

**B.     FWW's Representative Claims.**

12.     The Complaint alleges that FWW, as a non-profit organization, also seeks relief on behalf of the general public pursuant to D.C. Code § 28-3905(k)(1)(C). Compl. ¶¶ 113, 117. Although the Complaint does not clearly specify what relief FWW is seeking on behalf of the general public, the Complaint can be fairly read to seek statutory and punitive damages—in addition to declaratory and injunctive relief—on behalf of the general public. *Id.* at ¶ 118 and Prayer for Relief.

13.     In addition, the Complaint alleges that FWW is a "public interest organization" within the meaning of D.C. Code § 28-3901(15) and that it seeking to bring a claim on behalf of "District consumers." *Id.* at ¶¶ 112, 116-17. Section 28-3905(k)(1)(D) permits public interest organizations to bring claims on behalf of a "consumer or class of consumers" if certain criteria are met. Here, the Complaint purports to assert CPPA claims on behalf of an undefined class of consumers. Although the Complaint does not specify what relief FWW is seeking on behalf of this class, the Complaint can be fairly read to seek statutory and punitive damages—in addition to declaratory and injunctive relief—on behalf of the class. *Id.* at ¶ 118 and Prayer for Relief.

14.     As explained more fully below, this case is properly removed to this Court because the Court has diversity jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446. Further, to the extent this action seeks damages on behalf of the general public or a class of consumers, the Court also has jurisdiction over the State Court Action pursuant to CAFA, such that this action may be removed to this Court under 28 U.S.C. §§ 1332(d) and 1441. Furthermore, this removal is proper because this Notice of Removal was timely filed pursuant to 28 U.S.C. § 1446(b)(3) and Smithfield has satisfied the procedural requirements for removal.

II.    **GROUNDS FOR REMOVAL**

A.    **This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).**

15.    "[A]ny civil action brought in State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant…" 28 U.S.C. § 1441(a). This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that (1) it is a civil action between citizens of different states, and (2) the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

1.    **There is complete diversity between the parties.**

16.    For purposes of jurisdiction under 28 U.S.C. § 1332(a) and removal under 28 U.S.C. § 1441(a), the diversity of citizenship requirement is met when all persons on one side of the litigation are citizens of different states from all persons on the other side of the litigation. *Strawbridge v. Curtiss*, 7 U.S. 267 (1806).

17.    For diversity purposes, the citizenship of a corporation—including a non-profit corporation—is the state where the corporation is incorporated and the state where the corporation has its principal place of business. *See Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006).

18.    According to the Complaint, FWW is, and at the time the Complaint was filed was, a non-profit corporation incorporated under the laws of Washington D.C. and had its principal place of business in Washington D.C. *See* Compl. at ¶ 13. FWW is therefore a citizen of Washington D.C. for purposes of federal diversity jurisdiction.

19.    Smithfield is, and at the time the Complaint was filed was, a corporation incorporated under the laws of Delaware and having its principal place of business in Virginia.

*See* Compl. at ¶ 18. Smithfield is therefore a citizen of Delaware and Virginia for purposes of federal diversity jurisdiction.

20.     By virtue of the above, there is complete diversity of citizenship between FWW, a citizen of Washington D.C., and Smithfield, a citizen of Delaware and Virginia.

### 2.  The amount in controversy is satisfied in this case.

21.     Courts consider several categories of relief in determining the amount in controversy in a CPPA action like this one. These categories of relief include statutory and punitive damages, attorneys' fees and expert fees, and the cost of injunctive relief, and such amounts "should be added together" to determine whether the amount in controversy requirement has been met. *See Bradford v. George Wash. Univ.*, 249 F. Supp. 3d 325, 334 (D.D.C. 2017) (adding regular damages, treble damages, punitive damages, and attorneys' fees to meet amount in controversy requirement in CPPA case); *Parker-Williams v. Charles Tini & Assoc., Inc.*, 53 F. Supp. 3d 149, 153-54 (D.D.C. 2014); *Zuckman v. Monster Beverage Corp.*, 958 F. Supp. 2d 293, 297 (D.D.C. 2013); *M3 USA Corp. v Haunert*, No. 20-cv-3784 (DLF), 2021 WL 1894847 (May 11, 2021); *Sloan v. Soul Circus, Inc.*, 2015 WL 9272838, at *7 (D.D.C. Dec. 18, 2015).

22.     In this action, FWW purports to seek (1) a declaration that Smithfield's conduct violated the CPPA; (2) injunctive relief enjoining Smithfield's conduct found to be in violation of the CPPA and requiring Smithfield to engage in corrective advertising; (3) statutory damages; (4) punitive damages; (5) attorneys' fees, experts' fees, and costs; and (6) any other equitable relief approved by the Court. Compl. at ¶¶ 10, 117-18, Prayer for Relief. For the reasons explained below, the value of the relief sought in this action by FWW in its own name and/or for its sole benefit is in excess of $75,000 when the various types of requested relief are added

together.

>    **a. Attorneys' and Expert Fees.**
>
>    **i.   The Total Attorneys' Fees That FWW Seeks in Its Own Name Will Exceed the Amount in Controversy Requirement.**

23.     The Complaint seeks an award of attorneys' fees and expert fees to FWW in its individual capacity. *See* Compl., Prayer for Relief (seeking an order "granting FWW costs, including reasonable attorneys' fees and expert fees").

24.     FWW does not seek an award of attorneys' fees or expert fees on behalf of or in the name of the general public or a class of consumers.

25.     Thus, all attorneys' fees and expert fees should be allocated to FWW in its individual capacity. *Zuckman* , 958 F. Supp. 2d 297, 301 (D.D.C. 2013) (noting that the court may consider relief "to which [plaintiff] would be personally entitled" in determining the amount in controversy, including the plaintiff's "share of the total [attorney's] fees"); Cf. *Breakman v. AOL LLC*, 545 F. Supp. 2d 96, 107 (D.D.C. 2008) (decided under prior version of CPPA and holding that attorney's fees in CPPA could only be allocated to plaintiff on a pro rata basis because "he is not bringing this action in his ***individual capacity***") (emphasis added)..

26.     In this case, attorneys' and expert fees alone will exceed $75,000.

27.     CPPA cases of a much smaller scale than this one frequently produce more than $75,000 in attorneys' fees alone. *See, e.g., Beck v. Test Masters Edu. Serv., Inc.*, 73 F. Supp. 3d 12, 20 (D.D.C. 2014) (granting fee petition in CPPA case for $854,623.90 in attorneys' fees); *In re InPhonic, Inc.*, 674 F. Supp. 2d 273, 290 (D.D.C. 2009) (awarding plaintiffs in CPPA case $483,753.37 in attorneys' fees and costs); *Williams v. First Gov't Mortg. & Investors Corp.*, 225 F. 3d 738, 747 (holding that attorneys' fee award of $199,340 under the CPPA was reasonable even though it was disproportionate to the damages award).

28.     Counsel for FWW (Public Justice, formerly known as Trial Lawyers for Public Justice) also routinely seek attorneys' fees and expert fees in similar types of cases amounting to well over $75,000, based on hourly rates ranging from $250 to $550. *See Community Assoc. for Restoration of the Enviro., Inc. v. Cow Palace, LLC*, Nos. 13-CV-3016-TOR, 13-CV-3017-TOR, 13-CV-3019-TOR,2016 WL 3582754, at *3, *18 (E.D. Wash. Jan 12, 2016) (Public Justice seeking attorneys' fees of $3,587,615.50 and expert fees for $542,088.60, and noting rates of Washington D.C.-based Public Justice attorneys); *Barrett v. West Chester Univ. of Penn. of State System of Higher Edu.*, 636 F. Supp. 2d 439, 442 (E.D. Penn. 2009) (Public Justice seeking attorneys' fees for $207,609.50 after only nine months of litigation).

29.     Based on the breadth of the allegations in the Complaint, it is a virtual certainty that FWW's attorneys' fees and expert fees will exceed $75,000.

### ii.  FWW's Attorneys' Fees and Expert Fees for Its Organizational CPPA Claim Will Exceed the Amount in Controversy Requirement.

30.     Courts considering the propriety of removal in CPPA cases consider the impact of a plaintiff's role as the initial and seminal plaintiff when bringing a CPPA case in its representative capacity. In such circumstances, courts consider the plaintiff's individual, non-aggregated share of any potential recovery by estimating the portion "properly attributed to [the plaintiff] in his role as the initial plaintiff." *Zuckman*, 958 F. Supp. 2d at 301  (considering the statutory damages, injunctive relief, and attorney's fees "to which [plaintiff] would be personally entitled" in determining the amount in controversy).

31.     Here, FWW is the initial and seminal plaintiff.

32.     Further, FWW is asserting an organizational injury in its own name that is materially different from the alleged injuries it claims the general public and consumers suffered. Specifically, FWW alleges the challenged statements injured the organization by "frustrat[ing]

FWW's mission of increased transparency" and "holding agribusiness organizations accountable," which required FWW to "divert staff time and resources away" from other activities. Compl. at ¶ 103. In contrast, FWW alleges that the challenged statements injured consumers by influencing them to buy more Smithfield products (i.e. economic harm) and misleading them about the risk of meat shortages and Smithfield's work safety practices. *Id*. at ¶ 14. The alleged injuries to consumers are separate and distinct from the alleged injury to FWW.

33.     FWW is not a consumer.

34.     FWW does not allege that it received the challenged statements in the District or that it was misled by them.

35.     Rather, FWW is asserting a claim in its own name under D.C. Code § 28-3905(k)(1)(C). This means that FWW is claiming that it suffered an "organizational" injury as a result of the challenged statements.

36.     To demonstrate standing to assert an organizational injury, FWW must plead and prove that: (1) a direct conflict exists between Smithfield's statements and FWW's mission; (2) the conduct is inhibiting the organization's daily operations; and (3) the organization is being forced to divert resources to counteract the conduct. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919-20 (D.D.C. 2015); *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 25-26 (D.D.C. 2011). FWW must satisfy each of these elements to bring a cause of action for, or seek relief in, its own name.

37.     FWW's is not bringing its organizational injury claim on behalf of the general public. Nor will the public's interest be affected by the determination of whether or not FWW suffered an organizational injury.

38.     At a minimum, FWW's attorneys' fees and expert fees incurred in litigating its own organizational injury claim cannot be allocated to the general public or consumers.

39.     FWW's attorneys' fees and expert fees incurred in litigating its own organizational injury claim will exceed $75,000.

40.     This is illustrated by similar CPPA claims brought by FWW's counsel.

41.     For example, in a case captioned *Animal Legal Defense Fund v. Hormel Foods Corp.*, Superior Court of the District of Columbia, Civil Division, Case No. 2016 CA 004744 B, Animal Legal Defense Fund ("ALDF") asserted organizational injuries and claims similar to the ones alleged by FWW in this case, by alleging that Hormel's "Natural Choice" advertising caused an organizational injury to ALDF.

42.     Although ALDF defeated an initial motion to dismiss based on lack of standing, upon summary judgment, the D.C. Superior Court dismissed ALDF's case for lack of standing because it had failed to present sufficient evidence of its allegations of organizational injury. To reach that outcome in the case, the parties incurred legal fees doing all of the following:

    a.  Conducting written discovery, including the production of thousands of documents related to ALDF's organizational injury claims, and ALDF's preparation and production of a detailed privilege log;

    b.  Depositions of four ALDF employees and complete a Rule 30(b)(6) deposition of ALDF; and

    c.  Filing and responding to detailed cross-motions for summary judgment, which included creating a significant record and briefing on standing.

43.     In resolving the question of ALDF's organizational standing, ALDF's attorneys were required to devote hundreds of hours of time (or more) to address whether ALDF had

standing to assert an organizational injury (and the court ultimately concluded it did not). Even applying a conservative estimate of 500 hours spent by ALDF's attorneys litigating the question of standing at a rate of $300 per hour, this means ALDF incurred $150,000 in attorneys' fees related ***solely*** to litigating whether it had standing to assert claims based on an organizational injury.

44.     Based on the above, Smithfield reasonably believes that similar costs will be incurred to litigate the question of whether FWW has organizational standing, an issue that has been raised, litigated, and declared to be lacking, in other cases brought by FWW before this Court. *See, e.g., Food & Water Watch v. Vilsack*, 79 F. Supp. 3d 174, 199-200 (D.D.C. 2015) (concluding that FWW did not have standing to assert claims, similar to the ones made here, of organizational injury based on FWW's alleged need "to expend additional resources on activities such as educating its members and the public").

45.     These attorneys' fees that will be spent litigating the organizational standing question cannot be allocated to the general public or to District consumers because these fees are attributable solely to litigation activities unique to FWW's individual claims. *Cf. Zuckman*, 958 F. Supp. 2d at 301.

46.     Based on FWW's role as the seminal plaintiff in this case, the clear pattern of CPPA and Public Justice cases awarding or seeking far more than $75,000, and the FWW-specific fees that will be amassed based on its allegations of organizational injury and standing alone, the FWW-specific attorneys' fees in this case are virtually assured to exceed the jurisdictional threshold of 28 U.S.C. § 1332(a). *See Zuckman*, 958 F. Supp. 2d at 301; *Dart*, 135 S. Ct. at 554 ("a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold").

### b.  Statutory and Punitive Damages

47.     In addition to attorneys' fees, FWW is also seeking statutory and punitive damages. Compl. at ¶¶ 10, 118.

48.     With regard to statutory damages, FWW's individual, non-aggregated statutory damages amount to at least $13,500. More specifically, D.C. Code indicates that, under the CPPA, a plaintiff may recover "[t]reble damages, or $1,500 ***per violation***, whichever is greater." D.C. Code Ann. § 28-3905(k)(2)(A)(ii) (emphasis added). FWW's Complaint explicitly identifies no less than nine alleged violations of the CPPA. *See* Compl. at ¶ 110(a)-(i) ("Smithfield has violated the CPPA by engaging in the following unfair and deceptive trade practices…"); *see also Cannon v. Wells Fargo Bank, N.A.*, 908 F. Supp. 2d 110, 113-14 (D.D.C. 2012) (calculating amount in controversy based on ten violations alleged in complaint multiplied by $1,500). At $1,500 per violation, FWW's alleged statutory damages therefore amount to at least $13,500, which may be added to FWW's shares of injunctive relief, punitive damages, and attorney's fees. *Zuckman*, 958 F. Supp. 2d at 297 (noting that with regard to statutory damages, attorney's fees, injunctive relief, and restitution, "the amounts sought should be added together.").

49.     Moreover, and based on the statutory-damages calculations above, even a 4:1 ratio of punitive damages to statutory damages would amount to over $60,000 in statutory and punitive damages specific to FWW alone. It is also likely that FWW will argue that a higher punitive damages award is appropriate if the statutory damages award is small.

### c.  Cost of Injunctive Relief

50.     In addition to seeking attorneys' fees, statutory damages, and punitive damages, FWW seeks injunctive relief related to corrective advertising.

51.     Jurisdiction exists when the cost to a defendant of complying with the requested injunction exceeds $75,000. *See, e.g., GEO Specialty Chems., Inc. v. Husisian*, 951 F. Supp. 2d 32, 39-40 (D.D.C. 2013); *Breathe DC v. Santa Fe Natural Tobacco Co.*, 232 F. Supp. 3d 163, 169 (D.D.C. 2017) (noting that the court was following circuit precedent by considering the cost of compliance to the defendant). The cost to Smithfield of complying with the corrective advertising requested by FWW would far exceed $75,000.

52.     Here, FWW is seeking injunctive relief in its own name to prevent FWW from "expend[ing] additional resources correcting the company's misrepresentations and counteracting the company's claims." Compl. at ¶ 105. Thus, the sweeping injunctive relief FWW seeks is uniquely tied to the work FWW alleges to have done including, but not limited to, "investigating and debunking" Smithfield's advertising, "correcting the company's misrepresentations," submitting Freedom of Information Act requests, and coordinating "public messaging efforts." *See id.* at ¶¶ 96, 104-05, 114. FWW alone stands to benefit from the injunctive relief it seeks.

53.     This is particularly true because all of the statements that FWW challenges are stale. Indeed, the Complaint identifies a minimum of twenty specific messages that FWW alleges violate the CPPA and should be subjected to corrective advertising. All of the statements FWW challenges published anywhere from eleven to sixteen months ago or pertain to issues related to the pandemic during that time frame. These specific messages include: (1) an April 12, 2020 press release; (2) a March 19, 2020 Facebook post; (3) a March 19, 2020 Twitter post; (4) an April 17, 2020 Facebook post; (5) an April 17, 2020 Twitter post; (6) an August 2, 2020 ad in the Washington Post; (7) an August 2, 2020 ad in the New York Times; (8) a "COVID Website" created in September 2020; (9) a "Health & Safety Website;" (10) a "Exports Website;" (11) an

April 25, 2020 Facebook post; (12) an April 25, 2020 Twitter Post; (13) a "Response Website;"
(14) a "PPE Website;" (15) a PPE information-related video available on the "PPE Website;"
(16) an April 30, 2020 Facebook post; (17) an April 30, 2020 Twitter post; (18) a May 12, 2020
Facebook post; (19) a May 12, 2020 Twitter post; and (20) Smithfield's 2020 Sustainability
Report. *See id.* at ¶¶ 29-35, 42, 52-54, 59.

54.     These statements generally fall into two categories. First, some of these
statements, made in the spring and summer of 2020, relate to whether the United States would be
at risk of meat shortages if all meat processing plants were shut down due to COVID-19. Given
the widespread availability of vaccines, changing health and regulatory environments, and the
lifting of federal and state restrictions, FWW does not and cannot allege that consumers believe
there is an ***ongoing risk*** that meat producers will be shut down or that there will be a resultant
shortage of meat available for purchase. It follows that consumers are not basing purchasing
decisions ***now and in the future*** on alleged misunderstandings about ***past*** threats to the meat
supply that were based on exceptionally different knowledge and circumstances during that
phase of the pandemic.

55.     A forward-looking injunction requiring Smithfield to retract or correct stale
statements will therefore benefit no one other than FWW, whose alleged organizational injury
stems from "significant time and resources" allegedly expended, and to be expended, by FWW
as an organization "to counteract false narratives peddled by industrial meat production
companies" about whether there was a risk of meat shortages in 2020. *Id.* at ¶ 17.

56.     Smithfield reasonably believes that it would cost over $75,000 to issue the type of
"corrective advertising" FWW previews in its Complaint related to Smithfield's' prior
statements about potential meat shortages. This includes the development of a corrected

message, actual content development, money needed to take out advertisements online and in print, time and money needed to re-develop already-existing websites, etc. *E.g., Breathe DC*, 232 F. Supp. 3d at 170 (crediting the defendant's contention that costs of corrective advertising would exceed $200,000); *Food & Water Watch, Inc. v. Tyson Foods, Inc.*, 2020 WL 1065553, at *5 (D.D.C. Mar. 5, 2020) (similar corrective advertising costs to exceed $400,000).

57.     The same principles also apply to FWW's request for corrective advertising related to the messaging surrounding the adequacy of Smithfield's worker safety measures during the height of the pandemic. At this point in time, vaccines are widely available and have been widely distributed nationwide, and states have largely eliminated emergency COVID-19 precautions.

58.     FWW does not and cannot allege that Smithfield's current worker safety practices related to COVID-19, let alone the messaging associated with such safety practices, are inadequate. Rather, FWW's suggestion that consumers are looking up or relying on statements about worker safety that Smithfield made during the height of the pandemic is grossly speculative. Thus, once again, FWW's request for an injunction that orders corrective advertising on this topic serves to benefit only FWW, which claims that it had to devote resources to investigating and countering narratives about worker safety during the height of the pandemic. *Id*. at ¶ 17.

59.     Based on the above, Smithfield reasonably estimates that it will cost over $75,000 to issue the type of corrective advertising FWW previews in its Complaint related to COVID-19 and worker safety because, as described *supra*, at paragraph 51, any corrective advertising campaign would require a substantial amount of time and money to develop a corrected message, develop actual content, take out advertisements online and in print, and re-develop the workers'

safety-related websites with which FWW takes issue.

60.     Taken in combination with the cost of corrective advertising related to meat supply shortages discussed above, the cost to Smithfield of injunctive relief amounts to at least $150,000.

61.     Even if corrective advertising is not limited solely to remedying FWW's alleged organizational injuries, the cost of complying with the injunctive relief should be apportioned accordingly based on the connection between the corrective advertising sought by FWW and the unique injuries FWW alleges to have sustained. Specifically, the cost of complying with the injunctive relief requested here should be apportioned in a way that acknowledges the increased value to FWW of injunctive relief over other District consumers who have not taken any action to address Smithfield's messaging. *See, e.g.*, *Zuckman*, 958 F. Supp. 2d at 301-02 (acknowledging multiple methods for apportioning costs of injunctive relief, and declining to apportion attorney's fees pro rata so as to "strike[] a proper balance" that "ensur[es] that [plaintiff's] expenditures…are not undervalued or diluted.").

62.     The cost of attorneys' and expert fees, statutory and punitive damages, and injunctive relief that must be allocated to FWW, when added together, exceeds the $75,000 jurisdictional threshold for the reasons discussed above. This amount in controversy requirement for diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) is therefore satisfied.

63.     Because there is complete diversity amongst the parties in this case and the amount in controversy exceeds $75,000, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

**B.      Alternatively, the Court has subject matter jurisdiction pursuant to CAFA and 28 U.S.C. § 1332(d).**

64.     In addition to asserting claims on its own behalf, FWW purports to bring this action "on behalf of the general public and interests of District consumers." Compl. at ¶ 117.

65.     In addition to seeking damages for itself, based on FWW's own allegations, the Complaint can plausibly be read as seeking damages on behalf of a class of District consumers. *See, e.g.*, *id.* at ¶ 10 (noting request for injunctive relief, statutory damages, punitive damages, fees and costs, and other equitable relief and stating "FWW…brings this case to hold Smithfield accountable under the CPPA for these consumer deceptions"); ¶¶ 36-37, 47 (alleging that Smithfield's messaging affected consumer purchasing); ¶ 118 (generally seeking statutory and punitive damages).

66.     Thus, in the alternative, this court also has jurisdiction pursuant to CAFA.

67.     The District of Columbia Court of Appeals has held that CPPA actions that seek damages and are brought on behalf of the general public are subject to the "framework long established by [Superior Court] Rule [of Civil Procedure] 23 to govern representative suits in the Superior Court." *Rotunda v. Marriot Intern., Inc.*, 123 A.3d 980, 982 (D.C. 2015); *see also Smith v. Abbott Laboratories, Inc.*, No. 16-501 (RJL), 2017 WL 3670194, at *2 (D.D.C. Mar. 31, 2017) ("*Rotunda* held that DCCPPA representative actions for money damages ***must*** comply with Rule 23") (emphasis added).

68.     Congress enacted CAFA to "facilitate adjudication of certain class actions in federal court." *Dart*, 135 S. Ct. at 554. Accordingly, CAFA extends a district court's original jurisdiction to any putative class action: (1) involving 100 or more class members; (2) with an aggregated amount in controversy exceeding $5 million dollars; and (3) in which any member of the plaintiff class is a citizen of a different country or state than any defendant. *See id.* at 552; 28

U.S.C. § 1332(d). In addition, "no antiremoval presumption attends cases invoking CAFA[.]" *Dart*, 135 S. Ct. at 554.

69.     CAFA permits removal in instances where a plaintiff relies on a "State statute…authorizing an action to be brought…as a class action." 28 U.S.C. § 1332(d)(1)(B).

70.     D.C. Code § 28-3905(k)(1)(D)(i) expressly authorizes actions to be brought as class actions. *Rotunda*, 123 A.3d at 982.

71.     To the extent that FWW is bringing this action on behalf of the general public and "District consumers," it meets CAFA's numerical threshold because there are hundreds of thousands of citizens of the District of Columbia, and FWW specifically alleges that it has "thousands" of members and supporters who reside there. Compl. at ¶¶ 13, 117.

72.     The aggregated amount in controversy in this case also exceeds $5 million dollars. Even if only 1,000 of the "thousands" of members and supporters identified in FWW's Complaint are considered, the amount in controversy is, at a minimum, $13,500,000. As noted *supra*, paragraphs 9 and 42, FWW's Complaint identifies at least nine alleged violations of the CPPA. *See also* Compl. at ¶ 110(a)-(i). Multiplying nine alleged violations times $1,500, pursuant to D.C. Code Ann. § 28-3905(k)(2)(A)(ii), amounts to $13,500 in statutory damages per individual. Thus, for the minimum of 1,000 District consumers/members identified in FWW's Complaint, the total aggregated amount in controversy comes out to $13,500,000, which easily exceeds the $5 million threshold for CAFA jurisdiction. See *Cannon*, 908 F. Supp. 2d at 113-14 (noting that paragraph of complaint alleging violations of different subsections of D.C. Code § 28-3904 amounted to ten violations in total that were to be aggregated for all members of the purported class for purposes of determining jurisdiction under CAFA).

73.     Moreover, for the reasons noted *supra*, paragraphs 6-9, FWW is diverse from Smithfield. Thus, the third requirement for CAFA jurisdiction is satisfied.

74.     Accordingly, to the extent that the State Court Action seeks damages and is brought on behalf of the general public, this Court has subject matter jurisdiction over this matter pursuant to CAFA.

## III.     THIS NOTICE OF REMOVAL IS TIMELY PURSUANT TO 28 U.S.C. § 1446(b)(3)

75.     Smithfield, the only defendant named in this action, was served with FWW's Complaint on June 30, 2021.

76.     This Notice of Removal is filed within the thirty-day timeline required by 28 U.S.C. § 1446(b)(1). Specifically, 28 U.S.C. § 1446(b)(1) indicates that a notice of removal in this case must be filed no later than thirty days after Smithfield was served with the Complaint.

77.     Because Smithfield is filing this Notice of Removal within thirty days of being served with the Complaint on June 30, 2021, removal of this action is timely.

## IV.     SMITHFIELD HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL

78.     As discussed herein, this Court has subject matter jurisdiction on the basis of diversity of citizenship under 28 U.S.C. § 1332(a), and under CAFA and 28 U.S.C. § 1332(d) in the alternative.

79.     Venue is proper pursuant to 28 U.S.C. § 1446(a) because the United States District Court for the District of Columbia is the federal district court of the United States for the district and division within which the State Court Action is pending, namely the Superior Court of the District of Columbia.

80.     This Notice of Removal is being timely filed within the thirty-day period for removal outlined in 28 U.S.C. § 1446(b)(1).

81.     As required by 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon Plaintiff, by and through its attorneys of record, and is also being filed with the clerk of the Superior Court of the District of Columbia. The Notice of Filing of Notice of Removal to be filed with the Superior Court of the District of Columbia is attached hereto as Exhibit B.

82.     A copy of the entire State Court Action docket is attached to this Notice of Removal. *See* Exhibit A. At the time of removal, there are no unresolved motions that have been filed in the State Court Action.

## V.     **RESERVATION OF RIGHTS**

83.     Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of Smithfield's right to assert any defense or affirmative matter, including without limitation any defense available under Fed. R. Civ. P. 12, or any other procedural or substantive defense available under State or Federal law.

84.     Smithfield expressly reserves the right to amend or supplement this Notice of Removal.

85.     If any question arises as to the propriety of the removal of this action, Smithfield requests the opportunity to conduct jurisdictional discovery, present additional evidence supporting removal, brief any disputed issues, and/or present oral argument in support of its position that this action is properly removable. *See Dart*, 135 S. Ct. at 554 (holding that "a short and plain statement of the grounds of removal" is all that is necessary to remove under 28 U.S.C. § 1446 and evidentiary submissions should be assessed during remand briefing).

## VI.    <u>CONCLUSION</u>

86.    WHEREFORE, Smithfield gives notice that this matter is removed to the United States District Court for the District of Columbia, and requests that this Court retain jurisdiction for further proceedings pursuant to 28 U.S.C. §§ 1441 and 1446.

Dated: July 30, 2021                          Respectfully submitted,


_/s/ Tiffany H. Riffer_
Tiffany H. Riffer (D.C. Bar No. 1020997)
FAEGRE DRINKER BIDDLE & REATH LLP
1050 K Street NW, Suite 400
Washington, DC 20001
Telephone: 202-312-7400
Facsimile: 202-312-7461
Email: tiffany.riffer@faegredrinker.com

_Attorney for Defendant Smithfield Foods, Inc._

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and by first class mail postage prepaid.

Counsel for Plaintiff Food & Water Watch:

> Randolph T. Chen
> Ellen Noble
> David S. Muraskin
> PUBLIC JUSTICE, PC
> 1620 L Street NW, Suite 630
> Washington, D.C. 20036
> rchen@publicjustice.net
> enoble@publicjustice.net
> dmuraskin@publicjustice.net
>
> E. Michelle Drake
> Joseph C. Hashmall
> BERGER MONTAGUE PC
> 43 S.E. Main Street, Suite 505
> Minneapolis, MN 55414
> emdrake@bm.net
> jhashmall@bm.net
>
> David Seligman
> TOWARDS JUSTICE
> 1410 High Street, Suite 300
> Denver, CO 80218
> david@towardsjustice.org
>
> Tarah Heinzen
> Emily Miller
> FOOD & WATER WATCH
> 1616 P St. NW, Suite 300
> Washington, D.C. 20036
> theinzen@fwwatch.org
> eamiller@fwwatch.org

/s/Tiffany H. Riffer
Tiffany H. Riffer