# EXHIBIT A

## 2021 CA 002020 B FOOD & WATER WATCH Vs. SMITHFIELD FOODS, INC. HMP

- Case Type:
- Civil II
- Case Status:
- Open
- File Date:
- 06/16/2021
- Action:
- Complaint for Deceit (Misrepresentation) Filed
- Status Date:
- 06/16/2021
- Next Event:
- 09/17/2021

| All Information | Party | Event | Docket | Receipt | Disposition |

### Party Information

**FOOD & WATER WATCH**
- Plaintiff

- Disposition
- Disp Date

| Alias |

**Party Attorney**
- Attorney
- CHEN, RANDOLPH T
- Attorney
- MURASKIN, DAVID S

**SMITHFIELD FOODS, INC.**
- Defendant

- Disposition
- Disp Date

| Alias |

**Party Attorney**
- Attorney
- RIFFER, TIFFANY H

### Events

| Date/Time | Location | Type | Result | Event Judge |
|---|---|---|---|---|
| 09/17/2021 09:30 AM | Courtroom 516 | Initial Scheduling Conference-60 | | PASICHOW, HEIDI M |

### Docket Information

| Date | Docket Text | Image Avail. |
|---|---|---|
| 06/16/2021 | Complaint for Deceit (Misrepresentation) Filed  Receipt: 474418  Date: 06/21/2021 | |
| 06/16/2021 | eComplaint Filed. Submitted 06/16/2021 06:17. TB<br>Attorney: CHEN, RANDOLPH T (1032644)<br>Attorney: MURASKIN, DAVID S (1012451)<br>FOOD & WATER WATCH (Plaintiff); | Image |
| 06/21/2021 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 09/17/2021   Time: 9:30 am<br>Judge: PASICHOW, HEIDI M   Location: Courtroom 516 | |

| Date | Docket Text | Image Avail. |
|---|---|---|
| 06/21/2021 | Issue Date: 06/21/2021<br>Service: Summons Issued<br>Method: Service Issued<br>Cost Per: $<br><br>    SMITHFIELD FOODS, INC.<br>    4701 Cox Rd., Suite 285<br>    GLEN ALLEN, VA  23060<br>    Tracking No: 5000234584 | |
| 06/22/2021 | Rule 7.1 Disclosure Statement Filed. Submitted 06/22/2021 17:53. kc.<br>Attorney: CHEN, RANDOLPH T (1032644)<br>FOOD & WATER WATCH (Plaintiff); | Image |
| 06/23/2021 | Complaint Package eServed to Filer | Image |
| 06/23/2021 | Praecipe Regarding Rule 7.1 Disclosures Statement Filed. Submitted 06/23/2021 13:29. ts.<br>Attorney: CHEN, RANDOLPH T (1032644) | Image |
| 07/13/2021 | Clarifying Praecipe Filed. Submitted 07/13/2021 17:26. mq<br>Attorney: HEINZEN, TARAH E (1019829)<br>FOOD & WATER WATCH (Plaintiff); | Image |
| 07/14/2021 | Affidavit of Service Filed. Submitted 07/14/2021 12:25. ts.<br>SMITHFIELD FOODS, INC. (Defendant); | Image |
| 07/14/2021 | Proof of Service<br>    Method    : Service Issued<br>    Issued    : 06/21/2021<br>    Service    : Summons Issued<br>    Served    : 06/30/2021<br>    Return    : 07/14/2021<br>    On      : SMITHFIELD FOODS, INC.<br>    Signed By : Julie Parrish<br><br>    Reason    : Proof of Service<br>    Comment    :<br><br>    Tracking #: 5000234584 | |
| 07/19/2021 | Praecipe to Enter Appearance Filed. Submitted 07/19/2021 18:25. mq<br>Attorney: RIFFER, TIFFANY H (1020997)<br>SMITHFIELD FOODS, INC. (Defendant); | Image |
| 07/19/2021 | Joint Stipulation to Extend Time to Answer to Complaint Filed. Submitted 07/19/2021 18:31. mq<br>Attorney: RIFFER, TIFFANY H (1020997)<br>SMITHFIELD FOODS, INC. (Defendant);  Receipt: 476135  Date: 07/20/2021 | Image |
| 07/19/2021 | Additional eFiling Document to Joint Stipulation to Extend Time to Answer to Complaint Filed. Submitted 07/19/2021 18:31. mq<br>Attorney: RIFFER, TIFFANY H (1020997) | Image |

### Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|---|---|---|---|
| 474418 | 06/21/2021 | CHEN, RANDOLPH T, Attorney | $120.00 |
| 476135 | 07/20/2021 | RIFFER, TIFFANY H, Attorney | $20.00 |
| Total | Total | Total | Total |
| | | | $140.00 |

### Case Disposition

| Disposition | Date | Case Judge | |
|---|---|---|---|
| Undisposed | | PASICHOW, HEIDI M | |

Case Details District of Columbia Superior Court

Filed
D.C. Superior Court
06/16/2021 06:17AM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **FOOD & WATER WATCH,**<br>a non-profit corporation,<br>1616 P St. NW, Suite 300<br>Washington, D.C. 20036<br><br>    Plaintiff,<br><br> v.<br><br>**SMITHFIELD FOODS, INC.,**<br>200 Commerce St.<br>Smithfield, VA 23430<br><br>  ***Serve on:***<br>  **CT Corp. System, Registered Agent**<br>  4701 Cox Rd., Suite 285<br>  Glen Allen, VA 23060<br><br>    Defendant. | Case No.: |

## COMPLAINT

### INTRODUCTION

1. Plaintiff Food & Water Watch (FWW), a non-profit advocacy organization focused on environmental and consumer protection, brings this consumer protection action against Smithfield Foods, Inc. (Smithfield), a multinational meatpacking company. This action seeks to hold Smithfield accountable under the District of Columbia Consumer Protection Procedures Act (CPPA). Throughout the COVID-19 pandemic, Smithfield has misled and continues to mislead consumers in the District of Columbia (District) about the state of the national meat supply chain and the company's workplace safety practices.

2.      Smithfield—a wholly owned subsidiary of multinational food conglomerate WH Group—is the largest pork processing company in the world. The company's products are widely distributed in the District, as well as throughout the nation and the globe.

3.      Throughout the COVID-19 pandemic, Smithfield has mounted a distinctly aggressive public relations campaign geared toward leveraging the pandemic to increase its profits. Through advertisements, social media statements, and website representations, Smithfield has adopted a two-step press offensive to address top-of-mind consumer issues during the pandemic.

4.      First, Smithfield has misrepresented to consumers that a countrywide meat shortage was imminent. This fearmongering creates a revenue-generating feedback loop. It stokes and exploits consumer panic—juicing demand and sales—and in turn, provides the company with a false justification to keep its slaughterhouses operating at full tilt, subjecting its workers to unsafe workplace health and safety conditions that have caused thousands of Smithfield workers to contract the virus.

5.      Second, Smithfield has misrepresented working conditions in its plants in an effort to allay heightened consumer concerns for worker safety. Line-level meatpacking workers, in part due to false fears of a meat shortage, have been required to work in person throughout the pandemic—often in cramped conditions on crowded production lines. Smithfield has repeatedly assured consumers through advertisements and a comprehensive social media campaign that the company's workers are adequately protected from the hazards of COVID-19. Indeed, the company has prominently featured workplace safety as an integral part of its marketing and branding efforts during the pandemic.

2

6.      However, Smithfield's messaging could not be further from the truth. To provide just one example on the meat shortage front, Smithfield gravely warned American consumers in April 2020 that the nation was "perilously close to the edge in terms of our meat supply." But notwithstanding this warning to domestic consumers that the end was near, Smithfield's foreign exports were surging—with multiple studies showing the company's pork exports to China hitting record highs that same month. Government data further refute Smithfield's doom-and-gloom warnings, showing that pork inventory held in "cold storage" warehouses was well into the hundreds of millions of pounds, which analysts have estimated could have kept grocery stores stocked with pork for months, even absent any additional production.

7.      Smithfield's reassurances on workplace safety were likewise deceptive and misleading. On this score, Smithfield's track record speaks for itself, with company slaughterhouses repeatedly emerging as epicenters for COVID-19 outbreaks. Moreover, Smithfield's representations to consumers regarding specific workplace safety protocols—depicted in detailed photographs, videos, and promotional copy amplified through Smithfield's website and social media accounts—are consistently refuted by safety citations issued by government regulators and the accounts of actual Smithfield workers.

8.      Smithfield's repeated engagement on these issues is material to consumers, as the pandemic has thrust food security and the safety of essential workers into the forefront of consumers' minds. Recent market surveys consistently show that both issues not only have high salience among consumers, but affect consumer purchasing behavior.

9.      In all, Smithfield chose to leverage the pandemic to its advantage. It stridently beat the drum on issues of enormous significance, exploiting consumers' fears about meat shortages and assuaging their concerns about workplace safety. And while the company's

3

campaign on these fronts has no doubt benefited its business, it is built on a series of egregious misrepresentations, deceptions, and falsehoods.

10.     FWW thus brings this case to hold Smithfield accountable under the CPPA for these consumer deceptions. FWW seeks injunctive relief, statutory damages, punitive damages, fees and costs, and other equitable relief to remedy Smithfield's inaccurate and irresponsible scaremongering about national meat shortages and the company's abject failure to fulfill its own workplace safety representations.

## JURISDICTION

11.     This Court has jurisdiction over the subject matter of this case pursuant to D.C. Code § 11-921(a).

12.     This Court has personal jurisdiction over Smithfield pursuant to D.C. Code § 13-423(a)(1), (a)(3), and (a)(4).

## PARTIES

13.     Plaintiff Food & Water Watch (FWW) is a national non-profit and public-interest organization that fights for safe food, clean water, and a livable climate for all by standing up to corporations and other destructive economic interests that put profits before people. FWW is headquartered in the District and has more than one million members and supporters nationwide, thousands of whom reside in the District. FWW's members and supporters include consumers who seek to purchase food products that are good for the environment and public health, and that are not produced at the expense of worker health, safety, and dignity. FWW dedicates significant resources to promoting the interests and rights of these consumers.

14.     One of FWW's priority issues is industrial livestock production, which it works to address through its "factory farm" campaign. FWW's factory farm advocacy seeks to reform the

4

industrial livestock production system, including slaughterhouses and meat processing plants, a highly consolidated industry that inflicts extensive harm on the environment and local communities by polluting the air and water, creating unsafe working conditions, and threatening food safety. FWW is engaged in numerous campaigns to challenge corporate control and consolidation in factory farming and hold industrial agribusinesses accountable for their adverse impacts on rural communities, workers, and the environment.

15.     FWW's factory farm campaign also seeks to increase transparency to consumers and the general public about how industrial agribusinesses operate, the pollutants they emit into communities and waterways, and the dangerous working conditions to which factory farm and processing plant workers are subjected. FWW conducts this work through grassroots organizing, media outreach, public education, policy advocacy, research, and litigation.

16.     FWW has prioritized its factory farm advocacy for at least ten years.

17.     FWW's factory farm advocacy efforts during the COVID-19 pandemic have also involved the expenditure of significant time and resources to counteract false narratives peddled by industrial meat production companies—including Smithfield specifically. These efforts, which have significantly drained FWW's time and resources, are alleged in more detail in Section III, *infra*.

18.     Defendant Smithfield Foods, Inc. is a meat production and processing company headquartered at 200 Commerce Street, Smithfield, VA 23430.

## FACTS

## I.     Smithfield's Business and Response to COVID-19.

19.     Smithfield is a multinational meatpacking company. Smithfield processes and sells a wide variety of fresh meat and packaged meat offerings nationwide. The company focuses

on pork and is the largest pork-processor in the world.[1] Smithfield's products are widely available in the District under a multitude of brand names, including Smithfield, Nathan's Famous, and Gwaltney.

20.     Smithfield controls a significant share of the United States pork processing market, estimated at approximately 26%.[2] The domestic pork processing market is heavily consolidated, with the four largest companies—of which Smithfield is the largest—controlling over 63% of the market.[3]

21.     To illustrate the scale of Smithfield's operations, in 2018, the company's total sales of fresh pork and packaged meats totaled 10 billion pounds, which generated over $15 billion in sales.[4]

22.     Smithfield is presently owned by WH Group, a Chinese multinational meatpacking conglomerate. WH Group acquired Smithfield in 2013 in a deal valued at $7.1 billion.[5]

23.     COVID-19 is a contagious and deadly respiratory disease caused by a novel coronavirus that emerged in the winter of 2019. The virus has caused, and continues to cause, significant disruption to society and the economy.

---

[1] Smithfield, *Who We Are*, https://www.smithfieldfoods.com/about-smithfield.

[2] *Fitch Affirms Smithfield Foods, Inc's IDR at "BBB"; Outlook Stable*, Fitch Ratings (July 9, 2019), https://www.fitchratings.com/research/corporate-finance/fitch-affirms-smithfield-foods-inc-idr-at-bbb-outlook-stable-09-07-2019.

[3] Food & Water Watch, *The Economic Cost of Food Monopolies* (Nov. 2012), https://foodandwaterwatch.org/wp-content/uploads/2021/03/Food-Monopolies-Report-Nov-2012.pdf.

[4] Smithfield, *A Quick Look at Our Global Food Company*, https://www.smithfieldfoods.com/sustainability/report/2018/page/smithfield-foods-at-a-glance.

[5] Doug Palmer, *U.S. approves purchase of Smithfield*, Politico (Sept. 6, 2013), https://www.politico.com/story/2013/09/us-china-smithfield-096399.

24.     Smithfield has mounted an aggressive public relations campaign to protect its business and brand in response to the pandemic.

25.     For example, Smithfield has repeatedly warned consumers about imminent shortfalls in the national meat supply through press releases, advertisements, and website representations. These scare tactics have pushed panicked consumers to stockpile meat and increased demand for Smithfield's products.

26.     Smithfield's public relations push also expressly addressed heightened consumer concerns about worker safety triggered by the pandemic. On a regular basis, Smithfield engaged consumers through advertisements, social media, and website representations, providing videos, photographs, and detailed written descriptions about the company's workplace safety efforts. This outreach has served Smithfield's business interests, responding directly to consumers' increased attention to workplace safety issues and burnishing the company's brand as a responsible employer attentive to the ongoing public health crisis.

27.     Smithfield's aggressive public relations campaign, however, is built on a series of repeatedly misleading and deceptive representations to consumers.

II.     **Smithfield's misrepresentations to District of Columbia consumers**.

A.     **Smithfield misled consumers that the nation was "perilously close to the edge in terms of our meat supply."**

28.     Smithfield has consistently put out consumer messaging during the pandemic that has sowed fear about the domestic meat supply. These statements have increased consumer anxiety about meat shortages and driven up demand for Smithfield's meat products.

29.     Smithfield clearly articulated this message from the very beginning of the pandemic in an April 12, 2020 press release regarding the closure of a Smithfield plant in Sioux Falls, SD due to a COVID-19 outbreak among the plant's workforce. The press release quoted

then-CEO Kenneth Sullivan, who expressly characterized the company's operations as necessary to stave off a national disaster (emphases added):[6]

> The closure of this facility, combined with a growing list of other protein plants that have shuttered across our industry, is pushing our country perilously close to the edge in terms of our meat supply. It is impossible to keep our grocery stores stocked if our plants are not running.
>
> Unfortunately, COVID-19 cases are now ubiquitous across our country. The virus is afflicting communities everywhere. The agriculture and food sectors have not been immune. Numerous plants across the country have COVID-19 positive employees. We have continued to run our facilities for one reason: to sustain our nation's food supply during this pandemic. We believe it is our obligation to help feed the country, now more than ever. We have a stark choice as a nation: we are either going to produce food or not, even in the face of COVID-19.

30.    Smithfield amplified this messaging through consumer-focused social media on its Facebook and Twitter accounts—which have over 60,700 and 14,600 followers, respectively. In Facebook and Twitter posts on March 19, 2020, Smithfield reiterated the message that "delivering food is of vital importance" during the pandemic and that the company played a "crucial part of our nation's response to #COVID19."[7] In April 17, 2020 Facebook and Twitter posts, Smithfield again reiterated this message, embedding a video advertisement addressing the COVID-19 pandemic and stating, "We are dedicated to keeping food on tables across the country, especially during these challenging times."[8]

31.    Smithfield's warnings about scarcity did not stop there. On August 2, 2020, Smithfield took out full-page advertisements (the "Advertisements") in the Sunday editions of numerous papers with national reach, including the *Washington Post* and *New York Times*—

---

[6] Smithfield Press Release (Apr. 12, 2020), https://www.smithfieldfoods.com/press-room/company-news/smithfield-foods-to-close-sioux-falls-sd-plant-indefinitely-amid-covid-19.

[7] Smithfield Tweet (Mar. 19, 2020), https://twitter.com/SmithfieldFoods/status/1240816912558366720?s=20.

[8] Smithfield Tweet (Apr. 17, 2020), https://twitter.com/SmithfieldFoods/status/1251146672056360960?s=20.

newspapers with local circulations that reach hundreds of thousands of District consumers.

Through the Advertisements, Smithfield represented to District consumers it was fulfilling its

"responsibility to others" by "prioritizing the American consumer" and "keeping food on tables

across the country."[9] An image of the Advertisement is provided below.



[9] Smithfield *Wash. Post* Advertisement, Aug. 2, 2020,
https://www.smithfieldfoods.com/pdf/Smithfield_New%20York%20Times_%20Advertisement.pdf.

32.     In approximately September 2020, Smithfield built out additional and voluminous consumer representations on a website related to COVID-19—which remain online as of the filing of this Complaint—captioned "The Truth About Smithfield Foods" (hereinafter, the "COVID Website"). The COVID Website expressly states: "It is time to set the record straight and correct fundamental inaccuracies about our company and values, our food supply chain and the agricultural sector."[10]

33.     On the COVID Website, under a caption titled "Get the Truth Here," Smithfield provides additional links to websites titled "Employee Health & Safety Amid COVID-19" (the "Health & Safety Website") and "Exports" (the "Export Website").[11]

34.     On the Health & Safety Website, Smithfield repeats its scarcity mantra. Under a caption titled "Our Purpose," Smithfield states the following (emphases added):[12]

> We have continued to run our processing plants, distribution centers, farms and feed mills for one reason: to sustain our nation's food supply during the COVID-19 pandemic. Operating is not a question of profits; it is a question of necessity. We believe it is our obligation to help feed the country and support American farmers, now more than ever. . . .
>
> But it is impossible to keep protein on tables across America if our nation's meat plants are not running. Beyond the implications to our food supply, our entire agricultural community is in jeopardy. So, yes, we do have a stark choice as a nation: we are either going to produce food or not? This question should not be up for debate.

35.     On that same website, Smithfield also addressed calls for the company to slow production line speeds, which would allow for increased distancing between workers on production lines and protect them from the spread of the virus. Smithfield rejected this proposal as entirely impossible: "[S]lowing [production] line speeds will force America's farmers to bury

---

[10] Smithfield, *The Truth*, https://www.smithfieldfoods.com/thetruth.

[11] *Id.*

[12] Smithfield, *Employee Health and Safety Amid COVID-19*, https://www.smithfieldfoods.com/thetruth/healthsafety.

desperately needed food in the ground, creating food insecurity and higher food prices for everyone including, most importantly, those who can least afford it. These are not scare tactics; they are inescapable realities."[13]

36.     Altogether, Smithfield's misrepresentations about meat shortages are material to consumers. It is plain that fearmongering can affect consumer purchasing behavior—such as by driving consumers to stockpile meat to avoid such a shortage. And indeed, Smithfield's messaging coincided with a surge in consumer demand for pork. Between March and July 2020, one market study found significant year-over-year increases in sales of fresh pork (up 20%), bacon (up 29%), and ham (up 20%).[14]

37.     In addition, a national survey of 1,150 consumers focusing on food industry issues relating to the pandemic found that "40% of consumers are buying meat more often now than before the pandemic." The survey also found that 49% of consumers were "concerned" or "extremely concerned" about the "safety and reliability of the U.S. food supply chain."[15]

38.     However, Smithfield's representations on this issue are contradicted by a robust body of publicly available data and investigative reports that demonstrate that the state of the meat supply chain was never at significant risk—and definitely never came close to approaching the state of imminent peril that Smithfield repeatedly communicated to consumers.

39.     According to one investigation conducted by USA Today that relied on analysis of U.S. Department of Agriculture (USDA) data and interviews with industry analysts, "Americans were never at risk of a severe meat shortage." This investigation found an

---

[13] *Id.*

[14] Keith Loria, *Pork products show retail strength during COVID-19*, Meat + Poultry (Sept. 22, 2020), https://www.meatpoultry.com/articles/23818-pork-products-show-retail-strength-during-covid-19.

[15] Menu Matters, *Identifying Solutions for Retail Frustrations – Consumer Pain Points During COVID-19*, https://co-nxt.com/blog/new-consumer-insights-on-covids-impact-on-food-industry/.

incongruity between representations about <u>domestic</u> meat shortages, which were belied by a spike in <u>foreign</u> meat exports. Indeed, USDA data between March and April 2020 showed that foreign exports of beef and pork "soared above the amounts seen a year earlier."[16]

40.     The ability of meatpacking companies to substantially increase foreign exports contradicts the notion that meat supplies were ever as dire as Smithfield represented. Another investigative article published in the *New York Times* reported on a similar export trend specifically with respect to Smithfield. This report found that while Smithfield was warning American consumers in April 2020 that the domestic meat supply was in danger, the company's foreign pork exports were surging to record highs. That same month, Smithfield exported 9,170 tons of pork to China—one of its highest monthly export totals in the past three years. In addition, USDA statistics for aggregate pork exports showed that April 2020 exports to China were up 22% year-over-year—the highest monthly total in 20 years—with whole pig carcasses constituting 40% of those exports.[17]

41.     This trend was further confirmed by a market study that examined annual pork exports through August 31, 2020. Consistent with the *USA Today* and *New York Times* reporting, the study found that pork exports to China linked with Smithfield's Chinese parent company WH Group were up 90% compared to the same period in 2017.[18]

---

[16] Kyle Bagenstose, *As leaders warned of US meat shortages, overseas exports of pork and beef continued*, USA Today (June 16, 2020), https://www.usatoday.com/story/news/investigations/2020/06/16/meat-shortages-were-unlikely-despite-warnings-trump-meatpackers/3198259001/.

[17] Michael Corkery & David Yaffe-Bellany, *As meat plants stayed open to feed Americans, exports to China surged*, N.Y. Times (June 16, 2020), https://www.nytimes.com/2020/06/16/business/meat-industry-china-pork.html?smid=tw-share.

[18] Karl Plume, *Surge in US pork exports to China led by Brazil's JBS, China's WH Group*, Reuters (Sept. 22, 2020), https://reuters.com/article/usa-trade-china-pork/update-1-surge-in-us-pork-exports-to-china-led-by-brazils-jbs-chinas-wh-group-idUSL2N2GJ2GF.

42.     Smithfield has responded to this media coverage regarding its spike in foreign exports. On its Export Website under a caption titled "The Truth About Exports," Smithfield provides a lengthy explanation for how a domestic meat shortage can actually coincide with a surge in foreign exports, citing a laundry list of factors ranging from a "commitment on China's part to purchase significantly more agricultural goods" following a thaw in trade tensions, to the claim that a "good portion of what is exported are items of little interest to domestic consumers," such as "hearts, livers, kidneys, stomachs, snouts, ears and tails."[19]

43.     However, this statement is long on rhetoric and short on evidence and falls far short of qualifying Smithfield's claims regarding national meat shortages. Indeed, the statement itself contradicts Smithfield's claims. For example, Smithfield states that: "[I]t is not surprising that export volumes remained high amidst COVID-19. The bottom line is surplus and byproducts are sold in export markets, not the other way around." (emphasis added).[20] But even accepting this as true—if it was a surplus that drove the exports, then the existence of that surplus contradicts Smithfield's claims that domestic supply was ever at risk.

44.     Even setting the export asymmetry aside, USDA "cold storage" data also contradict Smithfield's claims, showing sizable stores of meat inventory held in reserve food supply warehouses. That data showed cold storage inventory of red meat and poultry products actually increased by about 40 million pounds from March to April, reaching 2.5 billion pounds in total. And moreover, that inventory was never drawn down by meatpacking companies.[21]

45.     An Institute for Agriculture and Trade Policy analyst reached similar conclusions regarding cold storage data. That analysis observed that cold storage inventory in February 2020

---

[19] Smithfield, *The Truth About Exports*, https://www.smithfieldfoods.com/thetruth/exports.

[20] *Id.*

[21] Bagenstose, *supra* note 16.

for <u>pork alone</u> was 650 million pounds—an amount that could supply grocery stores at current stocking rates for up to 14 months even assuming no additional pork production.[22]

46.     Other industry experts provided similarly reassuring assessments. A March 15, 2020 *New York Times* article quoted Julie Anna Potts, the chief executive of the North American Meat Institute, a trade group for meatpackers and producers (of which Smithfield is a member), as saying: "There is food being produced. There is food in warehouses. There is plenty of food in the country." That same article quoted the National Chicken Council (a trade group for chicken packers and producers) as confirming there were "ample surplus supplies of chicken in cold storage."[23]

47.     Altogether, Smithfield's public messaging amounted to a scaremongering campaign, exploiting consumer fear about food insecurity. These statements, however, were misleading, deceptive, and contradicted by the facts. And worst of all, Smithfield exploited consumer fear to protect its bottom line—conjuring the false specter of a dwindling food supply to artificially stoke consumer demand and keep the company's operations and revenues high during a time when many consumers were cutting back on other purchases due to financial insecurities caused by the pandemic.

**B.  Smithfield misled consumers regarding its worker safety practices.**

48.     Meatpacking plants and their workers are uniquely vulnerable to the spread of COVID-19. This is because meatpacking plants are crowded indoor workspaces, where employees frequently work shoulder-to-shoulder for extended periods engaging in strenuous

---

[22] Dr. Steven Suppan, *Cold hard (storage) facts about meatpacker threats of scarcity*, Institute for Ag. & Trade Policy (May 1, 2020), https://www.iatp.org/blog/202005/cold-hard-storage-facts-about-meatpacker-threats-scarcity.

[23] Michael Corkery, David Yaffe-Bellany, Amelia Nierenberg, & Quoctrung Bui, '*There is plenty of food in this country*,' New York Times (Mar. 15, 2020), https://www.nytimes.com/2020/03/15/business/coronavirus-food-shortages.html.

labor. Indeed, in May 2020, the Centers for Disease Control and Prevention (CDC) released a report titled *COVID-19 Among Workers in Meat and Poultry Processing Facilities*, finding that "the crowded conditions for workers in meat and poultry processing facilities could result in high risk for SARS-CoV-2 transmission" and that "[r]espiratory disease outbreaks in this type of setting demonstrate the need for heightened attention to worker safety."[24]

49.     Throughout the pandemic, Smithfield has represented to consumers that it has paid heightened attention to workplace safety. The company has made—and continues to make—express and specific statements about the company's workplace safety practices. Through social media posts, advertisements, and website representations, Smithfield has aggressively curated the impression that the company's workplace safety protocols are more than sufficient to protect its frontline workers.

50.     These representations serve Smithfield's business interests because workplace safety issues are material to consumers making purchasing decisions—as demonstrated by multiple surveys conducted during the pandemic. For example, one national survey of 1,150 consumers focusing on food industry issues relating to the pandemic found that 57.1% of consumers were either "extremely concerned" or "concerned" regarding the "health safety due to coronavirus of people who work in the food industry." Moreover, it found that 40% of consumers had actually changed their purchasing decisions due to concerns for food industry workers, such as by declining to buy certain brands, declining to buy certain products, and declining to shop at certain stores.[25]

51.     Another survey of 2,200 consumers examining pandemic effects on consumer

---

[24] CDC, *Covid-19 Among Workers in Meat and Poultry Processing Facilities—19 States, April 2020* (May 1, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e3.htm.

[25] Menu Matters, *Identifying Solutions for Retail Frustrations*, *supra* note 15.

thinking found that "consumers are much more likely to buy from companies that . . . treat their employees with flexibility and empathy (84% [of survey respondents])." In addition, 67% of respondents found it "very important" that companies they purchase goods from "Take care of their employees and treat them well, even in tough times."[26]

52.     Smithfield itself has acknowledged that consumers have contacted the company to directly inquire about workplace safety practices—and the company has directly responded to these concerns. On April 25, 2020, Smithfield made social media posts on Facebook (60,700+ followers) and Twitter (14,600+ followers) stating: "<u>We've received your questions and hear your concerns about employee safety</u>. We want you to know that we're doing everything in our power to help protect our coworkers from COVID-19." (emphasis added).[27] Screenshots of these posts are provided below:




---

[26] Morning Consult, *Weathering the Storm – Brand Management in the COVID-19 Era* 12-13 (2020), https://go.morningconsult.com/CT-2020-04-15-1377-Weathering-The-Storm-In-The-COVID-19-Era_LP-Download.html.

[27] Smithfield Tweet (Apr. 25, 2020), https://twitter.com/SmithfieldFoods/status/1254178472953614341?s=20.

53.     These social media posts linked to a Smithfield website titled "Our COVID-19 Response" (the "Response Website"). The Response Website represented to consumers that Smithfield was "doing everything in our power to help protect our team members from COVID-19 in the workplace," and provided specific representations about its efforts, including "Boosted personal protective equipment, including masks" and "Relaxed attendance policies to eliminate any punitive effect for missing work due to COVID-19."[28] The Response Website was accessible through at least May 2020, though at some point thereafter, the URL redirected to Smithfield's COVID Website.

54.     In late April 2020, Smithfield launched another website titled "COVID-19 PPE" (the "PPE Website").[29] The PPE Website provided a video depicting the company's PPE protocols and additional representations specific to PPE. Smithfield also amplified the PPE Website by linking to it in April 30 and May 12 Facebook and Twitter posts advertising the company's workplace safety efforts.[30] The PPE Website remains accessible as of the filing of this Complaint at https://www.smithfieldfoods.com/covid19ppe.

55.     Smithfield's Advertisements published in the August 2, 2020 editions of the *Washington Post* and *New York Times* also reassured consumers regarding workplace safety. In the Advertisements—which featured a large image of a masked worker—the company defended itself from growing criticism over workplace safety, claiming that critics were "fueled by misinformation and disinformation" and that "[e]very decision" the company makes "is

---

[28] Internet Archive, Smithfield, *Our COVID-19 Response*, (Apr. 24, 2020),
https://web.archive.org/web/20200424135636/https://www.smithfieldfoods.com/ourcovid19response.

[29] Internet Archive, Smithfield, *COVID-19 PPE* (May 15, 2020),
https://web.archive.org/web/20200515042033/https://www.smithfieldfoods.com/covid19ppe.

[30] Smithfield Tweet (Apr. 30, 2020), https://twitter.com/SmithfieldFoods/status/1255941131491254273?s=20;
Smithfield Tweet (May 12, 2020), https://twitter.com/SmithfieldFoods/status/1260331129435049984?s=20.

rooted in responsibility and delivered with integrity." Smithfield advertised that it had prioritized the safety of its workers by "implementing aggressive measures to protect their health and safety during this pandemic."[31]

56.     Smithfield's COVID Website (launched in approximately September 2020) also dedicated substantial copy to defending the company's workplace safety practices. The COVID Website remains accessible as of the filing of this Complaint at https://www.smithfieldfoods.com/thetruth (a screenshot is also provided below).



57.     The COVID Website links to Smithfield's Health & Safety Website, which specifically purports to provide "The Truth About Worker Health and Safety Amid COVID-19" and offers detailed information about Smithfield's workplace safety practices. The Health & Safety Website remains accessible as of the filing of this Complaint at https://www.smithfieldfoods.com/thetruth/healthsafety.

---

[31] Smithfield *Wash. Post* Advertisement, Aug. 2, 2020, https://www.smithfieldfoods.com/pdf/Smithfield_New%20York%20Times_%20Advertisement.pdf.

58.     On its Health & Safety Website, Smithfield stridently defends its worker safety record, representing to consumers that the "accusation that we have been unwilling to implement worker protections for the sake of profits is patently and demonstrably false" and that the company has "done everything possible to protect employee health and safety." The Health & Safety Website also describes Smithfield's purported workplace safety practices in extensive detail.[32]

59.     Finally, in June 2021, Smithfield published its 2020 Sustainability Report ("Sustainability Report"). The Sustainability Report includes a section dedicated to "Worker Health and Safety" and includes detailed disclosures about the company's response to COVID-19 and its workplaces safety protocols.[33]

60.     Together, Smithfield's repeated, detailed, and fulsome assertions disseminated to consumers through multiple media create the impression that its workplace safety protocols are more than adequate. But while these representations may have protected Smithfield's brand and reassured uneasy consumers, they were deceptive and misleading. In fact, the company's frontline workers did not receive the full measure of protections that Smithfield advertised.

61.     As an initial matter, Smithfield's aggressive defense of its workplace safety practices is belied by the company's COVID-19 record, which paints a starkly different picture. While public reporting on COVID-19 outbreaks at Smithfield plants is largely limited to the early stages of the pandemic, even this narrow window reveals a company case count numbering well into the thousands of workers. These outbreaks—which also include one major outbreak as recently as January 2021—include, but are not limited to:

---

[32] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[33] Smithfield, Sustainability Report, https://sustainability.smithfieldfoods.com/getmedia/8abeb529-091a-4076-86f2-f0ef0f66a08c/2020_Smithfield_Sustainability_Impact_Report.pdf.

- **Sioux Falls, SD**. 1,294 employees tested positive and four died at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[34]

- **Vernon, CA**. 784 employees tested positive and five died at a Farmer John meat processing plant (a Smithfield-owned subsidiary) in an outbreak beginning in April 2020 and with new cases continuing to be reported through January 2021.[35]

- **Crete, NE**. 333 employees tested positive and one died at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[36]

- **Tar Heel, NC**. 281 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[37]

- **Monmouth, IL**. 188 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to September 2020.[38]

- **Clinton, NC**. 170 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[39]

- **Cudahy, WI**. 105 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[40]

- **Milan, MO**. 77 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[41]

---

[34] Kimberly Kindy, *More than 200 meat plant workers in the U.S. have died of covid-19*, Wash. Post (Sept. 13, 2020), https://www.washingtonpost.com/national/osha-covid-meat-plant-fines/2020/09/13/1dca3e14-f395-11ea-bc45-e5d48ab44b9f_story.html.

[35] Leah Douglas & Georgia Gee, *A COVID outbreak at a California meatpacking plant started a year ago—and never went away*, Mother Jones (Mar. 16, 2021), https://www.motherjones.com/food/2021/03/a-covid-outbreak-at-a-california-meatpacking-plant-started-a-year-ago-and-never-went-away/.

[36] Leah Douglas, *Mapping Covid-19 outbreaks in the food system*, Food & Env. Reporting Network (Apr. 22, 2020), https://thefern.org/2020/04/mapping-covid-19-in-meat-and-food-processing-plants/.

[37] *Id.*

[38] Jane Carlson, *Data: Monmouth Smithfield plant had 188 cases*, Galesburg Reg. Mail (Oct. 13, 2020), https://www.galesburg.com/story/news/coronavirus/2020/10/13/data-monmouth-smithfield-plant-had-188-cases/114314146/.

[39] Douglas, *Mapping Covid-19, supra* note 36.

[40] *Id.*

[41] Madison McVan, *COVID-19 outbreak at Smithfield Foods meatpacking plant in Missouri likely larger than originally known, OSHA documents say*, Investigate Midwest (May 10, 2021), https://investigatemidwest.org/2021/05/10/covid-19-outbreak-at-smithfield-foods-meatpacking-plant-in-missouri-likely-larger-than-originally-known-osha-documents-say/.

- **St. Charles, IL**. 64 employees tested positive and three died at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[42]

62.     In addition to this stark data, Smithfield's workplace safety representations are also contradicted by a variety of sources, including the company's own policies, records made by government regulators, and worker accounts.

> **i.  Smithfield's representations regarding its PPE policies and protocols are misleading.**

63.     Smithfield has made PPE—and specifically, the provision of protective masks—a consistent refrain in its messaging to consumers. For example (all emphases added):

a. The Response Website (posted no later than April 25, 2020) represented that Smithfield had "Boosted personal protective equipment, <u>including masks</u>."[43]

b. The PPE Website (posted no later than May 1, 2020) represents: "<u>Every employee involved </u>in the handling, preparing and processing of food wears personal protective equipment covering their heads, faces (including masks and face shields), hands and bodies."[44]

c. The Health & Safety Website (posted in approximately September 2020) represents that Smithfield has spent "tens of millions of dollars on personal protective equipment (PPE) to include millions of masks and face shields to outfit every single team member," which was done as "<u>quickly as CDC guidance was issued</u> and supplies became available."[45]

64.     However, Smithfield's actual workplace safety record contradicts these representations. The facts show that Smithfield had repeated lapses in providing workers with protective masks well after the company made these representations and CDC updated its guidance to recommend face coverings in public settings on April 3, 2020. [46]

---

[42] Douglas, *Mapping Covid-19, supra* note 36.

[43] Smithfield, *Our COVID-19 Response*, *supra* note 28.

[44] Smithfield, *COVID-19 PPE*, *supra* note 29.

[45] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[46] The CDC first recommended face coverings to the general public on April 3, 2020. *See* Internet Archive, CDC, *Recommendation Regarding the Use of Cloth Face Coverings* (Apr. 3, 2020), http://web.archive.org/web/20200403221424/https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html ("CDC recommends wearing cloth face coverings in public settings where other social

65.     The most recent example involves Smithfield's Vernon, CA plant.[47] There, the California Division of Occupational Safety and Health (Cal/OSHA) issued a citation against Smithfield on November 12, 2020—months after the above representations above were made. The citation penalized Smithfield $58,100 for various workplace safety violations following a six-month investigation. The citation found that Smithfield "failed to implement and maintain an effective Injury and Illness Prevention Program" through its "[f]ailure to provide or ensure the use of face coverings to prevent the release of infectious particles into the air when persons are breathing, speaking, coughing, or sneezing." The citation also required Smithfield to abate the violations by December 1, 2020.[48]

66.     Notwithstanding this citation and order to abate, just a few months later in January 2021, the Vernon plant reported over 300 COVID-19 cases.[49]

67.     Similar lapses were reported at Smithfield's meatpacking plant in Sioux Falls, SD. There, in early March, union representatives requested a suite of protective measures—including protective masks—from Smithfield management.[50] However, management dragged its feet and by the time the virus was spreading through the plant in early April, employees repeatedly reported being unable to access protective masks.[51] Indeed, even when the company finally did provide workers with face coverings, they were thin and flimsy; pictures sent by

---

distancing measures are difficult to maintain (e.g., grocery stores and pharmacies) especially in areas of significant community-based transmission.").

[47] Douglas & Gee, *supra* note 35.

[48] Cal/OSHA Citation and Notification of Penalty to Smithfield Foods, Inc. (Nov. 12, 2020), https://www.dir.ca.gov/dosh/coronavirus/citations/11.12.2020_Smithfield-Foods_Inc_1476723.pdf.

[49] Douglas & Gee, *supra* note 35.

[50] Jessica Lussenhop, *Coronavirus at Smithfield pork plant: The untold story of America's biggest outbreak*, BBC (Apr. 17, 2020), https://www.bbc.com/news/world-us-canada-52311877.

[51] *E.g.*, *id.*; Lee Fang, *Employees say Smithfield plant in Wisconsin concealed Covid-19 infections*, The Intercept (Apr. 19, 2020), https://theintercept.com/2020/04/19/smithfield-foods-wisconsin-coronavirus/.

workers to local newspaper *The Argus Leader* showed coverings that resembled a hairnet (pictured below)—far less protective than a surgical mask or even one made of cloth.[52]



68.     Ultimately, the Occupational Safety and Health Administration (OSHA) inspected the Sioux Falls plant and issued Smithfield a citation in September 2020 for "failing to protect employees from exposure to the coronavirus."[53] In all, Smithfield's Sioux Falls plant went on to become one of the largest workplace COVID-19 outbreaks over the course of the pandemic, with 1,294 cases and four employees dying from the disease.

69.     Finally, in addition to these formal citations, worker accounts from other Smithfield plants across the country detail similar PPE lapses. At a Smithfield plant in Cudahy, WI, workers reported in April 2020 that their attempts to bring their own masks were met with reprimands by Smithfield's human resources department and threats of suspension.[54] Another Smithfield worker at a plant in Tar Heel, NC similarly reported to the North Carolina

---

[52] Makenzie Huber, *Smithfield workers asked for safety from COVID-19. Their company offered cash*, Argus Leader (Apr. 9, 2020), https://www.argusleader.com/story/news/2020/04/09/smithfield-foods-workers-criticize-conditions-coronavirus-covid-19/5124387002/.

[53] OSHA Press Release (Sept. 10, 2020), https://www.osha.gov/news/newsreleases/region8/09102020.

[54] Fang, *supra* note 51.

Department of Labor in April 2020 that managers would not allow workers to wear masks.[55] In

addition, at a Smithfield plant in Milan, MO, workers reported a lack of masks entirely

throughout early April.[56]

> ii. **Smithfield's representations regarding its social distancing policies and protocols are misleading.**

70.     On the issue of social distancing, Smithfield has largely resisted implementing

this protective measure altogether. Smithfield has defended this resistance in its consumer-facing

statements by repeatedly insisting that social distancing is simply not possible on production

lines. For example (all emphases added):

> a. The PPE Website represents that Smithfield has "installed plexiglass and other physical barriers on the production floor and in break areas. This is especially important in areas where social distancing is not possible like on production lines." [57]

> b. The Health & Safety Website represents: "In places where social distancing isn't possible due to the unavoidable constraints of the existing buildings, we have—at substantial expense—constructed temporary or permanent spaces to spread out. If adding space isn't feasible, we have protected our workers by installing thousands of physical barriers to help prevent the spread of the virus." [58]

> c. The Sustainability Report represents: "Because physical distancing is not possible in all areas of a meat-processing facility, we purchased plexiglass and other physical barriers to protect our workers."[59]

71.     However, this blanket assertion of impossibility is not supported by the facts.

Most notably, the CDC itself directly provided Smithfield with an explanation of how social

---

[55] NC Watchdog Reporting Network, *As COVID-19 spread in NC meatpacking plants, workplace complaints piled up*, News & Observer (July 28, 2020), https://www.newsobserver.com/news/coronavirus/article244545857.html.

[56] Madison McVan, *Milan meat processing plant workers cite unsafe COVID conditions*, Columbia Missourian (Apr. 16, 2020), https://www.columbiamissourian.com/news/covid19/milan-meat-processing-plant-workers-cite-unsafe-covid-conditions/article_b2c655f4-7f2b-11ea-85e8-fb32c440c477.html.

[57] Smithfield, *COVID-19 PPE*, *supra* note 29.

[58] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[59] Sustainability Report, *supra* note 33, at 62.

distancing could be achieved on its production lines. Following the explosive outbreak at

Smithfield's Sioux Falls plant, the South Dakota Department of Health requested CDC

"assistance in developing strategies to help reduce SARS-CoV-2 infections among Smithfield

Foods Sioux Falls pork processing plant employees."[60] The CDC conducted an evaluation and

issued an April 22, 2020 memorandum, cc'ing Smithfield executives, that contained

recommendations to protect against viral spread. In that memorandum, the CDC expressly

recommended that social distancing practices could be implemented with corresponding changes

in the company's production practices, namely reducing line speeds:

> Staggering employees along line workstations so that employees are not
> working directly across from each other. <u>Changes in production practices
> (e.g., line speed reductions) may be necessary in order to maintain
> appropriate distancing among employees.</u>[61]

72.    Occupational health and safety experts also refute Smithfield's claims. For

example, Deborah Berkowitz, formerly the Chief of Staff at OSHA and now the Director of the

Worker Health and Safety Program at the National Employment Law Project, questioned this

claim in sworn congressional testimony. In a March 2, 2021 hearing before the United States

House of Representatives regarding the Health and Safety Protections for Meatpacking, Poultry

and Agricultural Workers, Ms. Berkowitz reiterated that the "number one" protective measure of

social distancing could be implemented with corresponding "changes in production practices."[62]

---

[60] CDC Memo re: Strategies to reduce COVID-19 transmission at the Smithfield Foods Sioux Falls Pork Plant at 1 (Apr. 22, 2020), https://covid.sd.gov/docs/smithfield_recs.pdf.

[61] *Id.* at 7.

[62] Testimony of Deborah Berkowitz, National Employment Law Project, Hr'g before U.S. House of Representatives re *Health & Safety Protections for Meatpacking, Poultry, and Agricultural Workers* 7-9 (Mar. 2, 2021), http://stage.nelp.org/wp-content/uploads/Testimony-of-Debbie-Berkowitz-NELP-Before-House-Subcommittee-on-Labor-HHS-Ed-and-related-agencies.pdf.

73.     Altogether, Smithfield's representations that social distancing on its production lines was categorically "not possible" misled consumers regarding the company's working conditions. These statements were deceptive because they amounted to gross oversimplifications, eliding obvious measures the company could have adopted had it been willing to tolerate changes to its production methods. These statements also provided Smithfield with a false justification to maintain the status quo, preserving its pre-pandemic business operations at the drastic expense of worker safety.

### iii. Smithfield's representations regarding its attendance and leave policies are misleading.

74.     Smithfield has also made numerous representations that it has maintained lenient attendance and leave policies during the pandemic to protect its workers. For example (all emphases added):

    a. The Response Website represented that Smithfield had "[r]elaxed attendance policies to eliminate any punitive effect for missing work due to COVID-19" and "[e]xplicitly instruct[ed] employees not to report to work if they are sick or exhibiting COVID-19 symptoms."[63]

    b. The Advertisements represented that Smithfield was "implementing aggressive measure to protect [employees'] health and safety" and "rewarding our team members on the frontline."[64]

    c. The Health & Safety Website represents that Smithfield has "put in place liberal leave and pay policies that have guaranteed pay for nearly 13,000 employees who were quarantined, but did not test positive for COVID-19, or were otherwise unable to attain 40 hours of work in a week."[65]

    d. The Health & Safety Website also represents that Smithfield has "absolutely no motivation—in fact, we are disincentivized—to have sick team members reporting to work."[66]

---

[63] Smithfield, *Our COVID-19 Response*, *supra* note 28.

[64] Smithfield *Wash. Post* Advertisement, Aug. 2, 2020, *supra* note 31.

[65] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[66] *Id.*

    e.  The Sustainability Report represents that: "We also adjusted our attendance policies and leave benefits to help ensure sick workers did not enter our plants and to support employees in a rapidly changing and uncertain time."[67]

75.    However, these representations to consumers about lenient attendance and leave policies are contradicted by Smithfield's actual policies throughout the pandemic.

76.    One systemic example is Smithfield's punitive attendance policy, which prior to the pandemic assessed employees with punitive "points" for missing work. These points accrued over time, and yielded various disciplinary consequences, including termination. As early as April 25, 2020, Smithfield represented to consumers in its Response Website that it "[r]elaxed" this policy to "eliminate any punitive effect for missing work due to COVID-19."[68]

77.    The situation on the ground, though, was much different. Workers at a Smithfield plant in Milan, MO, reported being assigned points even when they took leave due to COVID-19 symptoms;[69] on information and belief, other workers reported being assigned points after being instructed to wait at home pending their COVID-19 test results.

78.    This was because Smithfield policies were not what they represented to the public. Far from flatly eliminating "any punitive effect for missing work due to COVID-19," Smithfield imposed stringent requirements that workers had to meet to avoid being penalized for missing work.[70] For example, at the Milan plant, displaying COVID-19 symptoms alone was not enough to stay at home and avoid points. Rather, to avoid being assigned points, such workers needed to obtain an order from Smithfield or a doctor to stay at home. [71]

---

[67] Sustainability Report, *supra* note 33, at 61.

[68] Smithfield, *Our COVID-19 Response*, *supra* note 28.

[69] Compl. at 18, *Doe v. Smithfield Foods, Inc.*, No. 20-06063 (W.D. Mo. 2020).

[70] *Id.*

[71] *Id.*

79.     Similarly, in an early April 2020 set of FAQs provided to a union representing workers at a Smithfield plant in Pennsylvania, Smithfield shifted the burden onto its <u>employees</u> to seek removal of points accrued due to COVID-19-related absences. Points would be automatically removed for employees "placed on a quarantine or anyone currently under a physician's care for a diagnosis of COVID-19," but other affected employees would have to "submit to HR a written request (including justification for the request) for other absences from work related to COVID-19 and ask that they be reviewed and removed." The FAQ also stated that this modest relaxation would only be through April 30, 2020, when it would be "re-evaluated . . . to determine if the standard should be continued."[72]

80.     Smithfield's representations that it had "absolutely no motivation" to encourage sick employees to report to work are also contradicted by the company's response to the pandemic. Most egregiously, in early April 2020, the virus was spreading quickly through multiple Smithfield slaughterhouses. But rather than halt operations, Smithfield chose to offer its employees a $500 "responsibility bonus" for workers who completed all their shifts through the end of the month. This bonus incentivized and pressured workers to continue reporting to work even if they were sick. The bonus was widely rolled out across multiple Smithfield plants, including those in Milan and Sioux Falls—worksites that would go on to experience outbreaks significant outbreaks.

81.     Worker accounts from other Smithfield plants also repeatedly contradict the company's representations that it does not pressure employees to work while sick. Numerous workers at Smithfield's Sioux Falls plant reported pressure to work while sick, with one worker

---

[72] Smithfield FAQ distributed to UFCW 1776, https://www.ufcw1776.org/covid/EmployerDocuments/04-April%202020/20200403/20200403%20Smithfield%20Combine.pdf.

exhibiting fever symptoms reporting that a supervisor instructed him to report to work and not tell anyone else about his fever.[73]

82.     Workers at a Smithfield distribution center in Greenfield, IN likewise reported that management permitted workers with fevers to complete their shifts after "cooling off" outside or in front of air conditioners, and that supervisors communicated to workers they were "lucky" to work in refrigerated conditions, claiming the virus could not survive the cold.[74]

### iv.  Smithfield's representations regarding its cooperation with state and local health authorities are misleading.

83.     Smithfield has also made several representations regarding its cooperation with state and local health authorities.

    a.  The Health & Safety Website represents: "Throughout the pandemic, we have partnered with our local and state health departments to help ensure COVID-19 cases among our employees are completely and accurately reflected at all levels of reporting. This collaborative approach ensures that the data is correctly and transparently disclosed."[75]

    b.  The Sustainability Report represents: "We also partnered with local and state health departments to help ensure COVID-19 cases among our employees were completely and accurately reflected at all levels of reporting. This collaborative approach ensured that the data was correctly and transparently disclosed."[76]

84.     Again, Smithfield's actual behavior belies this commitment. Smithfield has consistently acted to subvert and undermine the enforcement efforts of state and local regulators on basic COVID-19 reporting and workplace safety standards.

---

[73] Stephen Groves, *For meat plant workers, virus makes a hard job perilous*, Wash. Times (Apr. 15, 2020), https://www.washingtontimes.com/news/2020/apr/15/for-meat-plant-workers-virus-makes-a-hard-job-peri/.

[74] Taylor Telford & Kimberly Kindly, *As they rushed to maintain U.S. meat supply, big processors saw plants become covid-19 hot spots, worker illnesses spike*, Wash. Post (April 25, 2020), https://www.washingtonpost.com/business/2020/04/25/meat-workers-safety-jbs-smithfield-tyson/.

[75] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[76] Sustainability Report, *supra* note 33, at 63.

85.     The most recent example of this subversive behavior involves Smithfield's management of its plant in Vernon, CA. Contrary to Smithfield's commitments to transparency, there is substantial evidence that the company has been significantly underreporting the plant's case count and failing to comply with state reporting requirements. Indeed, Cal/OSHA's November 12, 2020 citation charges Smithfield for having "failed to enter 303 recordable COVID-19 illnesses of its own employees and contract employees" on its illness record logs and also having "failed to provide [Cal/OSHA] with access" to those records.[77]

86.     Similar lapses were reported at other Smithfield plants early in the pandemic. At a plant in Cudahy, WI, workers accused Smithfield managers in April 2020 of concealing the number of infections, pressuring employees to avoid quarantine measures, and failing to provide PPE.[78] The plant would go on to report 105 total COVID-19 cases.

87.     At Smithfield's plant in Milan, Missouri, the company declined to provide figures on the scope of the outbreak. A local hospital director reported in late May that there had been 35 cases tied to the plant. OSHA then released a report in September finding that the plant's outbreak in April through May was at least twice as large as originally reported, jumping from 35 cases to 77, and that more than 300 workers were suspected of having the virus or having been in close contact with positive cases.[79]

88.     At another plant in Crawford County, IA, local health officials struggled to reach Smithfield managers altogether. Through increasingly frustrated emails, the county public health director enlisted the support of other local government officials to no avail, concluding in a March 31, 2020 email: "We're likely to have an explosion of cases in Crawford and surrounding

[77] Cal/OSHA Citation, *supra* note 48.

[78] Fang, *supra* note 51.

[79] McVan, *COVID-19 outbreak at Smithfield Foods*, *supra* note 41.

counties if we don't get a handle on this. . . . We cannot impact the business if they won't respond to us."[80]

89.     Notably, when Smithfield did choose to engage with government officials, the company acted to undermine public safety efforts. For example, in March 2020, as state governors were scrambling to issue stay-at-home orders to curb the initial spread of the virus, Smithfield's then-CEO Kenneth Sullivan reached out directly to Nebraska Governor Pete Ricketts. In a letter, Mr. Sullivan stated he had "grave concerns" that stay-at-home orders were causing "hysteria" and warned, "We are increasingly at a very high risk that food production employees and others in critical supply chain roles stop showing up for work." Mr. Sullivan also added: "Social distancing is a nicety that makes sense only for people with laptops."[81]

### III.     FWW was injured by Smithfield's conduct.

90.     Throughout the pandemic, FWW has expended significant time and resources investigating and debunking Smithfield's misleading claims on both the meat shortage and workplace safety fronts. FWW has acted to educate its members, consumers, and the general public about Smithfield's misleading statements by publishing numerous investigative articles counteracting the company's representations.

91.     FWW has spent considerable time and resources investigating the truth of Smithfield's claims about meat shortages. For example, between April and November 2020, FWW issued at least 19 Freedom of Information Act (FOIA) requests regarding meat export

---

[80] Michael Grabell & Bernice Yeung, *Meatpacking companies dismissed years of warnings but now say nobody could have prepared for Covid-19*, ProPublica (Aug. 20, 2020), https://www.propublica.org/article/meatpacking-companies-dismissed-years-of-warnings-but-now-say-nobody-could-have-prepared-for-covid-19.

[81] Michael Grabell, Claire Perlman, & Bernice Yeung, *Emails reveal chaos as meatpacking companies fought health agencies over COVID-19 outbreaks in their plants*, ProPublica (June 12, 2020), https://www.propublica.org/article/emails-reveal-chaos-as-meatpacking-companies-fought-health-agencies-over-covid-19-outbreaks-in-their-plants.

certificates in order to compare meatpacking companies' domestic-facing claims with their foreign-facing export practices. FWW has also expended time and resources analyzing and examining publicly available data to investigate the truth of Smithfield's claims.

92.     FWW has also put resources into using the information it obtained from those FOIAs and other investigations to counteract Smithfield's misleading statements, and thereby better inform FWW's members, consumers, and the general public. On April 22, 2020, FWW published an article entitled, *"Fact Checking Smithfield's Coronavirus Food Shortage BS."*[82] In the article, FWW responded directly to Smithfield's April 12, 2020 press release warning that meat shortages were "perilously close." FWW explained that this claim was "[d]efinitely not" true, and cited data indicating "copious amounts of meat in cold storage around the country" and overproduction "destined for overseas markets" that "could be rerouted to shore up domestic supplies." FWW concluded:

> Corporations like Smithfield routinely choose profit over public health—their business model is built on it. Let's be clear: they are pushing to prematurely reopen slaughterhouses and other processing facilities because their closure threatens the meat industry's profits—NOT our country's food supply. And this callousness and greed is causing food workers to die.

93.     On May 26, 2020, FWW published another article counteracting the meat shortage claim. In an article titled, *USDA Spent Memorial Day Weekend Distorting Meat Production*, FWW provided an analysis of USDA export and cold storage data, which indicated meat exports as of May 22, 2020 were "up 36 percent from the prior 4-week average" and cold

---

[82] FWW, *Fact-Checking Smithfield's Coronavirus Food Shortage BS* (Apr. 22, 2020), https://www.foodandwaterwatch.org/2020/04/22/fact-checking-smithfields-bs-about-food-shortages-during-coronavirus-shutdowns/.

storage inventory was "up 2.1% over April 2019 levels." FWW's analysis concluded that the

USDA data "proves industry warnings of impending meat shortages to be false."[83]

94.      FWW also educated consumers on this issue through social media (on Facebook

alone, the organization has over 160,000 followers). For example, on April 23, 2020, FWW

published a Facebook post linking to its *Fact Checking Smithfield's Coronavirus Food Shortage*

*BS* article and specifically refuting Smithfield's representations that a national meat shortage was

"perilously close."[84] On August 25, 2020, FWW published another Facebook post stating,

"Smithfield . . . claimed there was a meat shortage in the U.S. – while exporting products

overseas for a profit. Our consolidated food system is costing consumers and putting workers'

lives at risk. We need change NOW."[85] Screenshots of these Facebook posts are provided below.




---

[83] FWW, *USDA Spent Memorial Day Weekend Distorting Meat Production* (May 26, 2020), https://www.foodandwaterwatch.org/2020/05/26/usda-spent-memorial-day-weekend-distorting-meat-production/.

[84] FWW, Facebook Post (Apr. 23, 2020), https://www.facebook.com/FoodandWaterWatch/posts/10157371753323031.

[85] FWW, Facebook Post (Aug. 25, 2020), https://www.facebook.com/FoodandWaterWatch/posts/10157721774263031.

95.     FWW also counteracted Smithfield's misleading statements by engaging with media outlets to more broadly communicate the organization's analysis to the general public and consumers. For example, investigative articles published by the *New York Times* and *USA Today* in June 2020 that cast doubt on meat shortage claims both quoted FWW representatives that refuted Smithfield's claims.[86]

96.     On Smithfield's workplace safety representations, FWW has also expended significant resources investigating and debunking these claims. In July 2020, FWW submitted over 15 FOIA requests to health and workplace safety agencies requesting information regarding COVID-19 cases and deaths to investigate how the virus was actually impacting meatpacking facilities.[87] This investigative effort was in response to meatpacking companies' (including Smithfield's) lack of transparency regarding COVID-19 case counts.

97.     FWW has also engaged in a robust public education campaign to inform consumers and the general public about the health and safety dangers faced by meatpacking workers—including Smithfield workers, specifically. As part of this campaign, FWW has expressly counteracted specific Smithfield misrepresentations and sought to educate consumers and the public about workplace safety conditions at Smithfield slaughterhouses.

98.     For example, in an August 4, 2020 Facebook post,[88] FWW directly refuted Smithfield's August 2 full-page Advertisement published in the *Washington Post* that featured a picture of a masked worker and defended the company's workplace safety record. FWW's Facebook post refuted Smithfield's defense, pointing out that "workers are dying and getting sick

---

[86] Bagenstose, *supra* note 16; Corkery & Yaffe-Bellany, *supra* note 17.

[87] FWW's FOIA requests sought information relating to meatpacking facilities in states including Arkansas, Colorado, Delaware, Kansas, Maryland, Nebraska, North Carolina, Virginia, and Wisconsin.

[88] FWW, Facebook Post (Aug. 4, 2020), https://www.facebook.com/FoodandWaterWatch/photos/a.92879533030/10157670916358031/.

in alarming numbers – with little to no protection from Smithfield." A screenshot of this

Facebook post is provided below.



99.     FWW also repeatedly sought to educate consumers and the public about

Smithfield's workplace safety failures. In an April 22, 2020 article, FWW shed light on how

meatpacking facilities were "already notoriously dangerous workplaces" that were made

increasingly hazardous by the pandemic. The article pointed out multiple specific lapses in

Smithfield's workplace safety practices, observing that workers reported a "work while sick"

culture; that Smithfield "offer[ed] workers in some plants a $500 'responsibility bonus'" for not

missing work in the early weeks of the pandemic; and that the company did not take adequate

measures to appropriately distance workers.[89]

100.     FWW's educational efforts took many additional forms. For example, in April

2020, FWW's Executive Director was interviewed by *Democracy Now* regarding safety failures

at Smithfield's Sioux Falls plant, where she commented on the company's lack of concern for

worker safety and failure to adequately distance workers in the facility.[90] FWW also leveraged

---

[89] FWW, *Fact-Checking Smithfield's Coronavirus Food Shortage BS* (Apr. 22, 2020),
https://www.foodandwaterwatch.org/2020/04/22/fact-checking-smithfields-bs-about-food-shortages-during-
coronavirus-shutdowns/.

[90] *'Terrified to Go to Work': Hundreds of Workers in Meat & Poultry Plants Test Positive for COVID-19*,
Democracy Now Interview with W. Hauter (Apr. 14, 2020),
https://www.democracynow.org/2020/4/14/us_meatpacking_facilities_coronavirus.

social media in its outreach efforts, criticizing Smithfield's failures to provide workers with masks and adequate social distancing in posts published on June 14 and June 28, 2020.[91]

101.    FWW also sought to educate consumers and the general public by amplifying the direct accounts of Smithfield workers. On June 4, 2020, FWW hosted a public webinar on *Workers, Food Safety, and the Global Pandemic*. The panel featured a workers' rights advocate who represented Smithfield workers at a plant in Milan, MO, who shared the struggle of Smithfield workers to get basic protective equipment and other safety measures implemented at the facility.[92]

102.    Finally, FWW's efforts on the workplace safety front have also included spearheading grassroots efforts to prevent dangerous increases in line speeds during the pandemic[93] that would endanger Smithfield workers and demanding state-issued emergency safety standards to better protect meatpacking workers from COVID-19 in the face of company inaction.[94]

103.    Smithfield's misrepresentations are ongoing. For example, in addition to the Sustainability Report published this June, the COVID Website, Health & Safety Website, and the PPE Website all remain online as of the filing of this Complaint. Smithfield has also failed to retract misrepresentations in the Advertisement and in the Response Website. These ongoing

---

[91] FWW Facebook Post (June 14, 2020), https://www.facebook.com/FoodandWaterWatch/posts/10157528924323031; FWW Facebook Post (June 28, 2020), https://www.facebook.com/FoodandWaterWatch/posts/10157568807458031.

[92] FWW Webinar, *Workers, Food Safety, and the Global Pandemic* (Jun. 4, 2020), https://www.facebook.com/FoodandWaterWatch/videos/568184237406169/.

[93] FWW, Demand Congress stop allowing USDA food safety waivers, https://secure.foodandwaterwatch.org/act/demand-congress-stop-allowing-usda-food-safety-waivers?ms=fwws_ot_03082021_issues-page&oms=fwws_ot_03082021_issues-page.

[94] Groups urge Maryland Gov. Hogan to issue emergency safety standard to protect workers from COVID-19, National Employment Law Project (Aug. 26, 2020), https://www.nelp.org/news-releases/groups-petition-governor-hogan-issue-emergency-safety-standard-protect-workers-covid-19/.

misrepresentations frustrate FWW's mission of increasing transparency in the industrial livestock production system and holding agribusiness corporations accountable for the harms they inflict on local communities and workers.

104.    In addition, because Smithfield's misrepresentations are ongoing, FWW will continue to divert staff time and resources away from its core factory farm work to further investigate and counteract the company's claims, including through additional FOIA inquiries and public messaging efforts.

105.    If this lawsuit fails to correct Smithfield's misrepresentations, this will put greater pressure on FWW to expend additional resources correcting the company's misrepresentations and counteracting the company's claims.

## COUNT I: VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT

106.    FWW incorporates the foregoing allegations into this Count.

107.    The CPPA is a remedial statute that is to be liberally construed. It establishes an enforceable right to truthful information from merchants about consumer goods that are or would be purchased or received in the District of Columbia.

108.    Smithfield is a "person" and a "merchant" under the CPPA because it is a corporation that supplies consumer goods—pork meat products—in the ordinary course of its business throughout the District. *See* D.C. Code § 28-3901(a)(1), (a)(3).

109.    The CPPA prohibits unfair and deceptive trade practices in connection with the sale and supply of consumer goods, "whether or not any consumer is in fact misled, deceived, or damaged thereby[.]" D.C. Code § 28-3904.

110.    Smithfield has violated the CPPA by engaging in the following unfair and deceptive trade practices:

a.  Smithfield's representations to District consumers, both express and implied, about the imminence of widespread meat shortages, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, misrepresented the quantity of Smithfield's goods in violation of D.C. Code § 28-3904(a);

b.  Smithfield's representations to District consumers, both express and implied, about the imminence of widespread meat shortages, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, are misrepresentations concerning material facts that have a tendency to mislead consumers in violation of D.C. Code § 28-3904(e);

c.  Smithfield's representations to District consumers, both express and implied, about the imminence of widespread meat shortages, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, used ambiguities concerning material facts that have a tendency to mislead consumers in violation of D.C. Code § 28-3904(f-1);

d.  Smithfield's representations to District consumers, both express and implied, about the imminence of widespread meat shortages, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, advertised goods without the intent to sell them as advertised in violation of D.C. Code § 28-3904(h);

e.  Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, misrepresented the characteristics of Smithfield's goods in violation of D.C. Code § 28-3904(a);

f.  Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, misrepresented the standard and quality by which Smithfield produced its goods in violation of D.C. Code § 28-3904(d);

g.  Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, are misrepresentations concerning material facts that have a tendency to mislead consumers in violation of D.C. Code § 28-3904(e);

38

h. Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, used ambiguities concerning material facts that have a tendency to mislead consumers in violation of D.C. Code § 28-3904(f-1); and

i. Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, advertised goods without the intent to sell them as advertised in violation of D.C. Code § 28-3904(h).

111.    Smithfield's violations of the CPPA were outrageous and egregious because the company willfully disregarded consumers' rights to truthful information on matters of great significance during a global health crisis.

112.    FWW is a "person," a "non-profit organization," and a "public interest organization" within the meaning of D.C. Code §§ 28-3901(1), (14), and (15).

113.    The CPPA authorizes non-profit organizations to "seek[] relief from the use of a trade practice in violation of a law of the District" and confers standing on such organizations that can demonstrate injury to the organization ("organizational standing"). D.C. Code § 28-3905(k)(1)(C) ("A nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District . . . .") (emphasis added).

114.    FWW has organizational standing pursuant to D.C. Code § 28-3905(k)(1)(C) because Smithfield's misrepresentations have perceptively impaired FWW's existing programs that advocate for increased safety and sustainability in the food system. FWW has also expended significant and increased resources to counteract Smithfield's misleading statements by investigating these statements and correcting these statements in educational outreach to consumers and the general public. Because Smithfield's representations are ongoing, FWW will

have to continue diverting staff time and resources away from its core factory farm work to further investigate and counteract Smithfield's claims.

115.   The CPPA also authorizes public interest organizations to "seek[] relief from the use by any person of a trade practice in violation of a law of the District" and confers standing on organizations that have a "sufficient nexus to the interests involved of the consumer . . . to adequately represent those interests" ("public interest standing"). D.C. Code § 28-3905(k)(1)(D).

116.   FWW has public interest standing pursuant to D.C. Code § 28-3905(k)(1)(D) because it advances the rights and interests of consumers by educating them on the environmental, public health, and workers' rights problems endemic to the food system, and advocates for policies that hold the industrial livestock industry accountable for its polluting and exploitative practices. Moreover, FWW has consistently sought to educate consumers on both these issues by contemporaneously and directly countering Smithfield's false statements issued throughout the course of the COVID-19 public health crisis. These advocacy efforts establish a direct—and more than sufficient—nexus to consumer interests such that FWW can adequately represent those interests.

117.   FWW brings this action on behalf of itself in its organizational capacity, as well as on behalf of the general public and interests of District consumers.

118.   FWW brings this action seeking the relief authorized under D.C. Code 28-3905(k)(2), including:

     a.   Injunctive relief, D.C. Code 28-3905(k)(2)(D);

     b.   Statutory damages of $1,500, D.C. Code 28-3905(k)(2)(A)(i);

     c.   Punitive damages, D.C. Code 28-3905(k)(2)(C);

     d.   Attorneys' fees and costs, D.C. Code 28-3905(k)(2)(B); and

e.   Any additional relief deemed needed or proper, D.C. Code 28-3905(k)(2)(E)-(F).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Food & Water Watch respectfully requests this Court enter a

judgment in its favor against Defendant Smithfield Foods, Inc. and grant the following relief

pursuant to D.C. Code § 28-3905(k)(2).

a.   a declaration that Smithfield's conduct misled and deceived District consumers in violation of the CPPA;

b.   an order enjoining Smithfield's conduct found to be in violation of the CPPA and requiring Smithfield to engage in corrective advertising to remedy its misrepresentations to District consumers;

c.   an order awarding FWW statutory damages of $1,500;

d.   an order awarding FWW punitive damages in an amount to be proven at trial;

e.   an order granting FWW costs, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law; and

f.   further relief, including equitable relief, as this Court may deem just and proper.

## JURY DEMAND

FWW demands a trial by jury.

Respectfully submitted,

Dated: June 16, 2021

*/s/ Randolph T. Chen*
Randolph T. Chen [D.C. Bar No. 1032644]
Ellen Noble [D.C. Bar No. 242053]
David S. Muraskin [D.C. Bar No. 1012451]
PUBLIC JUSTICE, PC
1620 L Street NW, Suite 630
Washington, D.C. 20036
Phone: (202) 797-8600
rchen@publicjustice.net
enoble@publicjustice.net
dmuraskin@publicjustice.net

[SIGNATURE BLOCK CONTINUES]

E. Michelle Drake [MN Bar No. 387366]*
Joseph C. Hashmall [MN Bar No. 392610]*
BERGER MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
emdrake@bm.net
jhashmall@bm.net

David Seligman [CO Bar No. 49394]*
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Phone: (720) 441-2236
david@towardsjustice.org

Tarah Heinzen [D.C. Bar No. 1019829]
Emily Miller [CA Bar No. 336417]*
FOOD & WATER WATCH
1616 P St. NW, Suite 300
Washington, D.C. 20036
Phone: (202) 683-2500
theinzen@fwwatch.org
eamiller@fwwatch.org

*Application for admission
*pro hac vice* forthcoming

*Counsel for Plaintiff Food & Water Watch*

# Superior Court of the District of Columbia

### CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

Food & Water Watch
_____

vs

Smithfield Foods, Inc.
_____

Case Number: _____

Date: **June 16, 2021**
_____

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Randolph T. Chen | Relationship to Lawsuit |
| Firm Name:<br>Public Justice, PC | ☒ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.:<br>(202) 797-8600          1032644 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury      ☐ 6 Person Jury      ☒ 12 Person Jury

Demand: $ <u>Statutory and Punitive Damages;</u>      Other: <u>Injunctive Relief</u>
          <u>Attorneys' Fees and Costs</u>

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____      Judge: _____      Calendar #:_____

Case No.:_____      Judge: _____      Calendar#:_____

---

**NATURE OF SUIT:**      *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☐ 01 Breach of Contract        ☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty       ☐ 17 OVER $25,000 Pltf. Grants Consent   ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument    ☐ 27 Insurance/Subrogation                ☐ 26 Insurance/Subrogation
☐ 07 Personal Property              Over $25,000 Pltf. Grants Consent          Over $25,000 Consent Denied
☐ 13 Employment Discrimination ☐ 07 Insurance/Subrogation              ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees         Under $25,000 Pltf. Grants Consent         Under $25,000 Consent Denied
                              ☐ 28 Motion to Confirm Arbitration
                                  Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile          ☐ 03 Destruction of Private Property   ☐ 05 Trespass
☐ 02 Conversion          ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process          ☐ 10 Invasion of Privacy          ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection    ☐ 11 Libel and Slander                   Not Malpractice)
☐ 03 Assault and Battery       ☐ 12 Malicious Interference        ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution      ☐ 19 Wrongful Eviction
☒ 05 Deceit (Misrepresentation) ☐ 14 Malpractice Legal           ☐ 20 Friendly Suit
☐ 06 False Accusation          ☐ 15 Malpractice Medical (Including Wrongful Death) ☐ 21 Asbestos
☐ 07 False Arrest              ☐ 16 Negligence- (Not Automobile,   ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                          Not Malpractice)                 ☐ 23 Tobacco
                                                                    ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D. REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

/s/ Randolph T. Chen                                    June 16, 2021
_____                    _____
Attorney's Signature                                            Date

CV-496/ June 2015

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Food & Water Watch
_____
Plaintiff

vs.

Smithfield Foods, Inc.                              Case Number _____
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Randolph T. Chen
_____
Name of Plaintiff's Attorney

Public Justice, PC
_____
Address
1620 L St. NW, S-630, Washington, DC 20036

(202)-797-8600
_____
Telephone

_____          _____
_Clerk of the Court_

By _____
              Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

Food & Water Watch
_____
                                    Demandante
              contra

                                                        Número de Caso: _____

Smithfield Foods, Inc.
_____
                                    Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarले por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Randolph T. Chen
_____          _SECRETARIO DEL TRIBUNAL_
Nombre del abogado del Demandante

Public Justice, PC
_____          Por: _____
Dirección                                                              Subsecretario
1620 L St. NW, S- 630, Washington, DC 20036
_____

(202)- 797- 8600
_____          Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

만일 번역을 원하시면 (202)879-4828 로 전화 하십시오.       የአማርኛ ትርጉም ለማግኘት: (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                        Super. Ct. Civ. R. 4

Filed
D.C. Superior Court
06/22/2021 17:53PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **FOOD & WATER WATCH**, | |
| Plaintiff, | Case No.: 2021 CA 002020 B |
| | Judge Heidi M. Pasichow |
| v. | Next Event: Initial Scheduling Conference |
| | Date: Sept. 17, 2021 |
| **SMITHFIELD FOODS, INC.,** | |
| Defendant. | |

## **PRAECIPE REGARDING RULE 7.1 DISCLOSURE STATEMENT**

I, the undersigned, counsel of record for Plaintiff Food & Water Watch (FWW), certify

pursuant to Superior Court Rule of Civil Procedure 7.1(a) that FWW has no parent corporation

and no publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 7.1(a), this filing includes two copies of this Praecipe.


Respectfully submitted,

Dated: June 22, 2021                    */s/ Randolph T. Chen*
                                         Randolph T. Chen [D.C. Bar No. 1032644]
                                         Ellen Noble [D.C. Bar No. 242053]
                                         David S. Muraskin [D.C. Bar No. 1012451]
                                         PUBLIC JUSTICE, PC
                                         1620 L Street NW, Suite 630
                                         Washington, D.C. 20036
                                         Phone: (202) 797-8600
                                         rchen@publicjustice.net
                                         enoble@publicjustice.net
                                         dmuraskin@publicjustice.net

                                         [SIGNATURE BLOCK CONTINUES]

E. Michelle Drake [MN Bar No. 387366]*
Joseph C. Hashmall [MN Bar No. 392610]*
BERGER MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
emdrake@bm.net
jhashmall@bm.net

David Seligman [CO Bar No. 49394]*
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Phone: (720) 441-2236
david@towardsjustice.org

Tarah Heinzen [D.C. Bar No. 1019829]
Emily Miller [CA Bar No. 336417]*
FOOD & WATER WATCH
1616 P St. NW, Suite 300
Washington, D.C. 20036
Phone: (202) 683-2500
theinzen@fwwatch.org
eamiller@fwwatch.org

*Application for admission
*pro hac vice* forthcoming

*Counsel for Plaintiff Food & Water Watch*

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **FOOD & WATER WATCH,** | |
| Plaintiff, | Case No.: 2021 CA 002020 B |
| | Judge Heidi M. Pasichow |
| v. | Next Event: Initial Scheduling Conference |
| | Date: Sept. 17, 2021 |
| **SMITHFIELD FOODS, INC.,** | |
| Defendant. | |

## PRAECIPE REGARDING RULE 7.1 DISCLOSURE STATEMENT

I, the undersigned, counsel of record for Plaintiff Food & Water Watch (FWW), certify pursuant to Superior Court Rule of Civil Procedure 7.1(a) that FWW has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 7.1(a), this filing includes two copies of this Praecipe.

Respectfully submitted,

Dated: June 22, 2021

/s/ Randolph T. Chen
Randolph T. Chen [D.C. Bar No. 1032644]
Ellen Noble [D.C. Bar No. 242053]
David S. Muraskin [D.C. Bar No. 1012451]
PUBLIC JUSTICE, PC
1620 L Street NW, Suite 630
Washington, D.C. 20036
Phone: (202) 797-8600
rchen@publicjustice.net
enoble@publicjustice.net
dmuraskin@publicjustice.net

[SIGNATURE BLOCK CONTINUES]

E. Michelle Drake [MN Bar No. 387366]*
Joseph C. Hashmall [MN Bar No. 392610]*
BERGER MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
emdrake@bm.net
jhashmall@bm.net

David Seligman [CO Bar No. 49394]*
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Phone: (720) 441-2236
david@towardsjustice.org

Tarah Heinzen [D.C. Bar No. 1019829]
Emily Miller [CA Bar No. 336417]*
FOOD & WATER WATCH
1616 P St. NW, Suite 300
Washington, D.C. 20036
Phone: (202) 683-2500
theinzen@fwwatch.org
eamiller@fwwatch.org

*Application for admission
*pro hac vice* forthcoming

*Counsel for Plaintiff Food & Water Watch*

Filed
D.C. Superior Court
06/28/2021 06:47PM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **FOOD & WATER WATCH**, <br> a non-profit corporation, <br> 1616 P St. NW, Suite 300 <br> Washington, D.C. 20036 <br><br> Plaintiff, <br><br> v. <br><br> **SMITHFIELD FOODS, INC.,** <br> 200 Commerce St. <br> Smithfield, VA 23430 <br><br> *Serve on:* <br> **CT Corp. System, Registered Agent** <br> 4701 Cox Rd., Suite 285 <br> Glen Allen, VA 23060 <br><br> Defendant. | Case No.:  **2021 CA 002020 B** |

## COMPLAINT

### INTRODUCTION

1.      Plaintiff Food & Water Watch (FWW), a non-profit advocacy organization focused on environmental and consumer protection, brings this consumer protection action against Smithfield Foods, Inc. (Smithfield), a multinational meatpacking company. This action seeks to hold Smithfield accountable under the District of Columbia Consumer Protection Procedures Act (CPPA). Throughout the COVID-19 pandemic, Smithfield has misled and continues to mislead consumers in the District of Columbia (District) about the state of the national meat supply chain and the company's workplace safety practices.

2.      Smithfield—a wholly owned subsidiary of multinational food conglomerate WH Group—is the largest pork processing company in the world. The company's products are widely distributed in the District, as well as throughout the nation and the globe.

3.      Throughout the COVID-19 pandemic, Smithfield has mounted a distinctly aggressive public relations campaign geared toward leveraging the pandemic to increase its profits. Through advertisements, social media statements, and website representations, Smithfield has adopted a two-step press offensive to address top-of-mind consumer issues during the pandemic.

4.      First, Smithfield has misrepresented to consumers that a countrywide meat shortage was imminent. This fearmongering creates a revenue-generating feedback loop. It stokes and exploits consumer panic—juicing demand and sales—and in turn, provides the company with a false justification to keep its slaughterhouses operating at full tilt, subjecting its workers to unsafe workplace health and safety conditions that have caused thousands of Smithfield workers to contract the virus.

5.      Second, Smithfield has misrepresented working conditions in its plants in an effort to allay heightened consumer concerns for worker safety. Line-level meatpacking workers, in part due to false fears of a meat shortage, have been required to work in person throughout the pandemic—often in cramped conditions on crowded production lines. Smithfield has repeatedly assured consumers through advertisements and a comprehensive social media campaign that the company's workers are adequately protected from the hazards of COVID-19. Indeed, the company has prominently featured workplace safety as an integral part of its marketing and branding efforts during the pandemic.

2

6.      However, Smithfield's messaging could not be further from the truth. To provide just one example on the meat shortage front, Smithfield gravely warned American consumers in April 2020 that the nation was "perilously close to the edge in terms of our meat supply." But notwithstanding this warning to domestic consumers that the end was near, Smithfield's foreign exports were surging—with multiple studies showing the company's pork exports to China hitting record highs that same month. Government data further refute Smithfield's doom-and-gloom warnings, showing that pork inventory held in "cold storage" warehouses was well into the hundreds of millions of pounds, which analysts have estimated could have kept grocery stores stocked with pork for months, even absent any additional production.

7.      Smithfield's reassurances on workplace safety were likewise deceptive and misleading. On this score, Smithfield's track record speaks for itself, with company slaughterhouses repeatedly emerging as epicenters for COVID-19 outbreaks. Moreover, Smithfield's representations to consumers regarding specific workplace safety protocols— depicted in detailed photographs, videos, and promotional copy amplified through Smithfield's website and social media accounts—are consistently refuted by safety citations issued by government regulators and the accounts of actual Smithfield workers.

8.      Smithfield's repeated engagement on these issues is material to consumers, as the pandemic has thrust food security and the safety of essential workers into the forefront of consumers' minds. Recent market surveys consistently show that both issues not only have high salience among consumers, but affect consumer purchasing behavior.

9.      In all, Smithfield chose to leverage the pandemic to its advantage. It stridently beat the drum on issues of enormous significance, exploiting consumers' fears about meat shortages and assuaging their concerns about workplace safety. And while the company's

campaign on these fronts has no doubt benefited its business, it is built on a series of egregious misrepresentations, deceptions, and falsehoods.

10.     FWW thus brings this case to hold Smithfield accountable under the CPPA for these consumer deceptions. FWW seeks injunctive relief, statutory damages, punitive damages, fees and costs, and other equitable relief to remedy Smithfield's inaccurate and irresponsible scaremongering about national meat shortages and the company's abject failure to fulfill its own workplace safety representations.

## JURISDICTION

11.     This Court has jurisdiction over the subject matter of this case pursuant to D.C. Code § 11-921(a).

12.     This Court has personal jurisdiction over Smithfield pursuant to D.C. Code § 13-423(a)(1), (a)(3), and (a)(4).

## PARTIES

13.     Plaintiff Food & Water Watch (FWW) is a national non-profit and public-interest organization that fights for safe food, clean water, and a livable climate for all by standing up to corporations and other destructive economic interests that put profits before people. FWW is headquartered in the District and has more than one million members and supporters nationwide, thousands of whom reside in the District. FWW's members and supporters include consumers who seek to purchase food products that are good for the environment and public health, and that are not produced at the expense of worker health, safety, and dignity. FWW dedicates significant resources to promoting the interests and rights of these consumers.

14.     One of FWW's priority issues is industrial livestock production, which it works to address through its "factory farm" campaign. FWW's factory farm advocacy seeks to reform the

industrial livestock production system, including slaughterhouses and meat processing plants, a highly consolidated industry that inflicts extensive harm on the environment and local communities by polluting the air and water, creating unsafe working conditions, and threatening food safety. FWW is engaged in numerous campaigns to challenge corporate control and consolidation in factory farming and hold industrial agribusinesses accountable for their adverse impacts on rural communities, workers, and the environment.

15.     FWW's factory farm campaign also seeks to increase transparency to consumers and the general public about how industrial agribusinesses operate, the pollutants they emit into communities and waterways, and the dangerous working conditions to which factory farm and processing plant workers are subjected. FWW conducts this work through grassroots organizing, media outreach, public education, policy advocacy, research, and litigation.

16.     FWW has prioritized its factory farm advocacy for at least ten years.

17.     FWW's factory farm advocacy efforts during the COVID-19 pandemic have also involved the expenditure of significant time and resources to counteract false narratives peddled by industrial meat production companies—including Smithfield specifically. These efforts, which have significantly drained FWW's time and resources, are alleged in more detail in Section III, *infra*.

18.     Defendant Smithfield Foods, Inc. is a meat production and processing company headquartered at 200 Commerce Street, Smithfield, VA 23430.

## FACTS

**I.     Smithfield's Business and Response to COVID-19.**

19.     Smithfield is a multinational meatpacking company. Smithfield processes and sells a wide variety of fresh meat and packaged meat offerings nationwide. The company focuses

on pork and is the largest pork-processor in the world.[1] Smithfield's products are widely available in the District under a multitude of brand names, including Smithfield, Nathan's Famous, and Gwaltney.

20.     Smithfield controls a significant share of the United States pork processing market, estimated at approximately 26%.[2] The domestic pork processing market is heavily consolidated, with the four largest companies—of which Smithfield is the largest—controlling over 63% of the market.[3]

21.     To illustrate the scale of Smithfield's operations, in 2018, the company's total sales of fresh pork and packaged meats totaled 10 billion pounds, which generated over $15 billion in sales.[4]

22.     Smithfield is presently owned by WH Group, a Chinese multinational meatpacking conglomerate. WH Group acquired Smithfield in 2013 in a deal valued at $7.1 billion.[5]

23.     COVID-19 is a contagious and deadly respiratory disease caused by a novel coronavirus that emerged in the winter of 2019. The virus has caused, and continues to cause, significant disruption to society and the economy.

---

[1] Smithfield, *Who We Are*, https://www.smithfieldfoods.com/about-smithfield.

[2] *Fitch Affirms Smithfield Foods, Inc's IDR at "BBB"; Outlook Stable*, Fitch Ratings (July 9, 2019), https://www.fitchratings.com/research/corporate-finance/fitch-affirms-smithfield-foods-inc-idr-at-bbb-outlook-stable-09-07-2019.

[3] Food & Water Watch, *The Economic Cost of Food Monopolies* (Nov. 2012), https://foodandwaterwatch.org/wp-content/uploads/2021/03/Food-Monopolies-Report-Nov-2012.pdf.

[4] Smithfield, *A Quick Look at Our Global Food Company*, https://www.smithfieldfoods.com/sustainability/report/2018/page/smithfield-foods-at-a-glance.

[5] Doug Palmer, *U.S. approves purchase of Smithfield*, Politico (Sept. 6, 2013), https://www.politico.com/story/2013/09/us-china-smithfield-096399.

24.     Smithfield has mounted an aggressive public relations campaign to protect its business and brand in response to the pandemic.

25.     For example, Smithfield has repeatedly warned consumers about imminent shortfalls in the national meat supply through press releases, advertisements, and website representations. These scare tactics have pushed panicked consumers to stockpile meat and increased demand for Smithfield's products.

26.     Smithfield's public relations push also expressly addressed heightened consumer concerns about worker safety triggered by the pandemic. On a regular basis, Smithfield engaged consumers through advertisements, social media, and website representations, providing videos, photographs, and detailed written descriptions about the company's workplace safety efforts. This outreach has served Smithfield's business interests, responding directly to consumers' increased attention to workplace safety issues and burnishing the company's brand as a responsible employer attentive to the ongoing public health crisis.

27.     Smithfield's aggressive public relations campaign, however, is built on a series of repeatedly misleading and deceptive representations to consumers.

## II.     Smithfield's misrepresentations to District of Columbia consumers.

### A.  Smithfield misled consumers that the nation was "perilously close to the edge in terms of our meat supply."

28.     Smithfield has consistently put out consumer messaging during the pandemic that has sowed fear about the domestic meat supply. These statements have increased consumer anxiety about meat shortages and driven up demand for Smithfield's meat products.

29.     Smithfield clearly articulated this message from the very beginning of the pandemic in an April 12, 2020 press release regarding the closure of a Smithfield plant in Sioux Falls, SD due to a COVID-19 outbreak among the plant's workforce. The press release quoted

then-CEO Kenneth Sullivan, who expressly characterized the company's operations as necessary to stave off a national disaster (emphases added):[6]

> The closure of this facility, combined with a growing list of other protein plants that have shuttered across our industry, is pushing our country perilously close to the edge in terms of our meat supply. It is impossible to keep our grocery stores stocked if our plants are not running.

> Unfortunately, COVID-19 cases are now ubiquitous across our country. The virus is afflicting communities everywhere. The agriculture and food sectors have not been immune. Numerous plants across the country have COVID-19 positive employees. We have continued to run our facilities for one reason: to sustain our nation's food supply during this pandemic. We believe it is our obligation to help feed the country, now more than ever. We have a stark choice as a nation: we are either going to produce food or not, even in the face of COVID-19.

30.     Smithfield amplified this messaging through consumer-focused social media on its Facebook and Twitter accounts—which have over 60,700 and 14,600 followers, respectively. In Facebook and Twitter posts on March 19, 2020, Smithfield reiterated the message that "delivering food is of vital importance" during the pandemic and that the company played a "crucial part of our nation's response to #COVID19."[7] In April 17, 2020 Facebook and Twitter posts, Smithfield again reiterated this message, embedding a video advertisement addressing the COVID-19 pandemic and stating, "We are dedicated to keeping food on tables across the country, especially during these challenging times."[8]

31.     Smithfield's warnings about scarcity did not stop there. On August 2, 2020, Smithfield took out full-page advertisements (the "Advertisements") in the Sunday editions of numerous papers with national reach, including the *Washington Post* and *New York Times*—

---

[6] Smithfield Press Release (Apr. 12, 2020), https://www.smithfieldfoods.com/press-room/company-news/smithfield-foods-to-close-sioux-falls-sd-plant-indefinitely-amid-covid-19.

[7] Smithfield Tweet (Mar. 19, 2020), https://twitter.com/SmithfieldFoods/status/1240816912558366720?s=20.

[8] Smithfield Tweet (Apr. 17, 2020), https://twitter.com/SmithfieldFoods/status/1251146672056360960?s=20.

newspapers with local circulations that reach hundreds of thousands of District consumers.

Through the Advertisements, Smithfield represented to District consumers it was fulfilling its

"responsibility to others" by "prioritizing the American consumer" and "keeping food on tables

across the country."[9] An image of the Advertisement is provided below.



---

[9] Smithfield *Wash. Post* Advertisement, Aug. 2, 2020,
https://www.smithfieldfoods.com/pdf/Smithfield_New%20York%20Times_%20Advertisement.pdf.

32.     In approximately September 2020, Smithfield built out additional and voluminous consumer representations on a website related to COVID-19—which remain online as of the filing of this Complaint—captioned "The Truth About Smithfield Foods" (hereinafter, the "COVID Website"). The COVID Website expressly states: "It is time to set the record straight and correct fundamental inaccuracies about our company and values, our food supply chain and the agricultural sector."[10]

33.     On the COVID Website, under a caption titled "Get the Truth Here," Smithfield provides additional links to websites titled "Employee Health & Safety Amid COVID-19" (the "Health & Safety Website") and "Exports" (the "Export Website").[11]

34.     On the Health & Safety Website, Smithfield repeats its scarcity mantra. Under a caption titled "Our Purpose," Smithfield states the following (emphases added):[12]

> We have continued to run our processing plants, distribution centers, farms and feed mills for one reason: to sustain our nation's food supply during the COVID-19 pandemic. Operating is not a question of profits; it is a question of necessity. We believe it is our obligation to help feed the country and support American farmers, now more than ever. . . .
>
> But it is impossible to keep protein on tables across America if our nation's meat plants are not running. Beyond the implications to our food supply, our entire agricultural community is in jeopardy. So, yes, we do have a stark choice as a nation: we are either going to produce food or not? This question should not be up for debate.

35.     On that same website, Smithfield also addressed calls for the company to slow production line speeds, which would allow for increased distancing between workers on production lines and protect them from the spread of the virus. Smithfield rejected this proposal as entirely impossible: "[S]lowing [production] line speeds will force America's farmers to bury

---

[10] Smithfield, *The Truth*, https://www.smithfieldfoods.com/thetruth.

[11] *Id.*

[12] Smithfield, *Employee Health and Safety Amid COVID-19*, https://www.smithfieldfoods.com/thetruth/healthsafety.

desperately needed food in the ground, creating food insecurity and higher food prices for everyone including, most importantly, those who can least afford it. These are not scare tactics; they are inescapable realities."[13]

36.     Altogether, Smithfield's misrepresentations about meat shortages are material to consumers. It is plain that fearmongering can affect consumer purchasing behavior—such as by driving consumers to stockpile meat to avoid such a shortage. And indeed, Smithfield's messaging coincided with a surge in consumer demand for pork. Between March and July 2020, one market study found significant year-over-year increases in sales of fresh pork (up 20%), bacon (up 29%), and ham (up 20%).[14]

37.     In addition, a national survey of 1,150 consumers focusing on food industry issues relating to the pandemic found that "40% of consumers are buying meat more often now than before the pandemic." The survey also found that 49% of consumers were "concerned" or "extremely concerned" about the "safety and reliability of the U.S. food supply chain."[15]

38.     However, Smithfield's representations on this issue are contradicted by a robust body of publicly available data and investigative reports that demonstrate that the state of the meat supply chain was never at significant risk—and definitely never came close to approaching the state of imminent peril that Smithfield repeatedly communicated to consumers.

39.     According to one investigation conducted by USA Today that relied on analysis of U.S. Department of Agriculture (USDA) data and interviews with industry analysts, "Americans were never at risk of a severe meat shortage." This investigation found an

---

[13] *Id.*

[14] Keith Loria, *Pork products show retail strength during COVID-19*, Meat + Poultry (Sept. 22, 2020), https://www.meatpoultry.com/articles/23818-pork-products-show-retail-strength-during-covid-19.

[15] Menu Matters, *Identifying Solutions for Retail Frustrations – Consumer Pain Points During COVID-19*, https://co-nxt.com/blog/new-consumer-insights-on-covids-impact-on-food-industry/.

incongruity between representations about <u>domestic</u> meat shortages, which were belied by a spike in <u>foreign</u> meat exports. Indeed, USDA data between March and April 2020 showed that foreign exports of beef and pork "soared above the amounts seen a year earlier."[16]

40.     The ability of meatpacking companies to substantially increase foreign exports contradicts the notion that meat supplies were ever as dire as Smithfield represented. Another investigative article published in the *New York Times* reported on a similar export trend specifically with respect to Smithfield. This report found that while Smithfield was warning American consumers in April 2020 that the domestic meat supply was in danger, the company's foreign pork exports were surging to record highs. That same month, Smithfield exported 9,170 tons of pork to China—one of its highest monthly export totals in the past three years. In addition, USDA statistics for aggregate pork exports showed that April 2020 exports to China were up 22% year-over-year—the highest monthly total in 20 years—with whole pig carcasses constituting 40% of those exports.[17]

41.     This trend was further confirmed by a market study that examined annual pork exports through August 31, 2020. Consistent with the *USA Today* and *New York Times* reporting, the study found that pork exports to China linked with Smithfield's Chinese parent company WH Group were up 90% compared to the same period in 2017.[18]

---

[16] Kyle Bagenstose, *As leaders warned of US meat shortages, overseas exports of pork and beef continued*, USA Today (June 16, 2020), https://www.usatoday.com/story/news/investigations/2020/06/16/meat-shortages-were-unlikely-despite-warnings-trump-meatpackers/3198259001/.

[17] Michael Corkery & David Yaffe-Bellany, *As meat plants stayed open to feed Americans, exports to China surged*, N.Y. Times (June 16, 2020), https://www.nytimes.com/2020/06/16/business/meat-industry-china-pork.html?smid=tw-share.

[18] Karl Plume, *Surge in US pork exports to China led by Brazil's JBS, China's WH Group*, Reuters (Sept. 22, 2020), https://reuters.com/article/usa-trade-china-pork/update-1-surge-in-us-pork-exports-to-china-led-by-brazils-jbs-chinas-wh-group-idUSL2N2GJ2GF.

42.     Smithfield has responded to this media coverage regarding its spike in foreign exports. On its Export Website under a caption titled "The Truth About Exports," Smithfield provides a lengthy explanation for how a domestic meat shortage can actually coincide with a surge in foreign exports, citing a laundry list of factors ranging from a "commitment on China's part to purchase significantly more agricultural goods" following a thaw in trade tensions, to the claim that a "good portion of what is exported are items of little interest to domestic consumers," such as "hearts, livers, kidneys, stomachs, snouts, ears and tails."[19]

43.     However, this statement is long on rhetoric and short on evidence and falls far short of qualifying Smithfield's claims regarding national meat shortages. Indeed, the statement itself contradicts Smithfield's claims. For example, Smithfield states that: "[I]t is not surprising that export volumes remained high amidst COVID-19. The bottom line is surplus and byproducts are sold in export markets, not the other way around." (emphasis added).[20] But even accepting this as true—if it was a surplus that drove the exports, then the existence of that surplus contradicts Smithfield's claims that domestic supply was ever at risk.

44.     Even setting the export asymmetry aside, USDA "cold storage" data also contradict Smithfield's claims, showing sizable stores of meat inventory held in reserve food supply warehouses. That data showed cold storage inventory of red meat and poultry products actually increased by about 40 million pounds from March to April, reaching 2.5 billion pounds in total. And moreover, that inventory was never drawn down by meatpacking companies.[21]

45.     An Institute for Agriculture and Trade Policy analyst reached similar conclusions regarding cold storage data. That analysis observed that cold storage inventory in February 2020

---

[19] Smithfield, *The Truth About Exports*, https://www.smithfieldfoods.com/thetruth/exports.

[20] *Id.*

[21] Bagenstose, *supra* note 16.

for pork alone was 650 million pounds—an amount that could supply grocery stores at current stocking rates for up to 14 months even assuming no additional pork production.[22]

46.     Other industry experts provided similarly reassuring assessments. A March 15, 2020 *New York Times* article quoted Julie Anna Potts, the chief executive of the North American Meat Institute, a trade group for meatpackers and producers (of which Smithfield is a member), as saying: "There is food being produced. There is food in warehouses. There is plenty of food in the country." That same article quoted the National Chicken Council (a trade group for chicken packers and producers) as confirming there were "ample surplus supplies of chicken in cold storage."[23]

47.     Altogether, Smithfield's public messaging amounted to a scaremongering campaign, exploiting consumer fear about food insecurity. These statements, however, were misleading, deceptive, and contradicted by the facts. And worst of all, Smithfield exploited consumer fear to protect its bottom line—conjuring the false specter of a dwindling food supply to artificially stoke consumer demand and keep the company's operations and revenues high during a time when many consumers were cutting back on other purchases due to financial insecurities caused by the pandemic.

### B.  Smithfield misled consumers regarding its worker safety practices.

48.     Meatpacking plants and their workers are uniquely vulnerable to the spread of COVID-19. This is because meatpacking plants are crowded indoor workspaces, where employees frequently work shoulder-to-shoulder for extended periods engaging in strenuous

---

[22] Dr. Steven Suppan, *Cold hard (storage) facts about meatpacker threats of scarcity*, Institute for Ag. & Trade Policy (May 1, 2020), https://www.iatp.org/blog/202005/cold-hard-storage-facts-about-meatpacker-threats-scarcity.

[23] Michael Corkery, David Yaffe-Bellany, Amelia Nierenberg, & Quoctrung Bui, '*There is plenty of food in this country*,' New York Times (Mar. 15, 2020), https://www.nytimes.com/2020/03/15/business/coronavirus-food-shortages.html.

labor. Indeed, in May 2020, the Centers for Disease Control and Prevention (CDC) released a report titled *COVID-19 Among Workers in Meat and Poultry Processing Facilities*, finding that "the crowded conditions for workers in meat and poultry processing facilities could result in high risk for SARS-CoV-2 transmission" and that "[r]espiratory disease outbreaks in this type of setting demonstrate the need for heightened attention to worker safety."[24]

49.     Throughout the pandemic, Smithfield has represented to consumers that it has paid heightened attention to workplace safety. The company has made—and continues to make—express and specific statements about the company's workplace safety practices. Through social media posts, advertisements, and website representations, Smithfield has aggressively curated the impression that the company's workplace safety protocols are more than sufficient to protect its frontline workers.

50.     These representations serve Smithfield's business interests because workplace safety issues are material to consumers making purchasing decisions—as demonstrated by multiple surveys conducted during the pandemic. For example, one national survey of 1,150 consumers focusing on food industry issues relating to the pandemic found that 57.1% of consumers were either "extremely concerned" or "concerned" regarding the "health safety due to coronavirus of people who work in the food industry." Moreover, it found that 40% of consumers had actually changed their purchasing decisions due to concerns for food industry workers, such as by declining to buy certain brands, declining to buy certain products, and declining to shop at certain stores.[25]

51.     Another survey of 2,200 consumers examining pandemic effects on consumer

---

[24] CDC, *Covid-19 Among Workers in Meat and Poultry Processing Facilities—19 States, April 2020* (May 1, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e3.htm.

[25] Menu Matters, *Identifying Solutions for Retail Frustrations*, *supra* note 15.

thinking found that "consumers are much more likely to buy from companies that . . . treat their employees with flexibility and empathy (84% [of survey respondents])." In addition, 67% of respondents found it "very important" that companies they purchase goods from "Take care of their employees and treat them well, even in tough times."[26]

52.      Smithfield itself has acknowledged that consumers have contacted the company to directly inquire about workplace safety practices—and the company has directly responded to these concerns. On April 25, 2020, Smithfield made social media posts on Facebook (60,700+ followers) and Twitter (14,600+ followers) stating: "We've received your questions and hear your concerns about employee safety. We want you to know that we're doing everything in our power to help protect our coworkers from COVID-19." (emphasis added).[27] Screenshots of these posts are provided below:

 

<hr />

[26] Morning Consult, *Weathering the Storm – Brand Management in the COVID-19 Era* 12-13 (2020), https://go.morningconsult.com/CT-2020-04-15-1377-Weathering-The-Storm-In-The-COVID-19-Era_LP-Download.html.

[27] Smithfield Tweet (Apr. 25, 2020), https://twitter.com/SmithfieldFoods/status/1254178472953614341?s=20.

53.     These social media posts linked to a Smithfield website titled "Our COVID-19 Response" (the "Response Website"). The Response Website represented to consumers that Smithfield was "doing everything in our power to help protect our team members from COVID-19 in the workplace," and provided specific representations about its efforts, including "Boosted personal protective equipment, including masks" and "Relaxed attendance policies to eliminate any punitive effect for missing work due to COVID-19."[28] The Response Website was accessible through at least May 2020, though at some point thereafter, the URL redirected to Smithfield's COVID Website.

54.     In late April 2020, Smithfield launched another website titled "COVID-19 PPE" (the "PPE Website").[29] The PPE Website provided a video depicting the company's PPE protocols and additional representations specific to PPE. Smithfield also amplified the PPE Website by linking to it in April 30 and May 12 Facebook and Twitter posts advertising the company's workplace safety efforts.[30] The PPE Website remains accessible as of the filing of this Complaint at https://www.smithfieldfoods.com/covid19ppe.

55.     Smithfield's Advertisements published in the August 2, 2020 editions of the *Washington Post* and *New York Times* also reassured consumers regarding workplace safety. In the Advertisements—which featured a large image of a masked worker—the company defended itself from growing criticism over workplace safety, claiming that critics were "fueled by misinformation and disinformation" and that "[e]very decision" the company makes "is

---

[28] Internet Archive, Smithfield, *Our COVID-19 Response*, (Apr. 24, 2020), https://web.archive.org/web/20200424135636/https://www.smithfieldfoods.com/ourcovid19response.

[29] Internet Archive, Smithfield, *COVID-19 PPE* (May 15, 2020), https://web.archive.org/web/20200515042033/https://www.smithfieldfoods.com/covid19ppe.

[30] Smithfield Tweet (Apr. 30, 2020), https://twitter.com/SmithfieldFoods/status/1255941131491254273?s=20; Smithfield Tweet (May 12, 2020), https://twitter.com/SmithfieldFoods/status/1260331129435049984?s=20.

rooted in responsibility and delivered with integrity." Smithfield advertised that it had prioritized the safety of its workers by "implementing aggressive measures to protect their health and safety during this pandemic."[31]

56.     Smithfield's COVID Website (launched in approximately September 2020) also dedicated substantial copy to defending the company's workplace safety practices. The COVID Website remains accessible as of the filing of this Complaint at https://www.smithfieldfoods.com/thetruth (a screenshot is also provided below).



57.     The COVID Website links to Smithfield's Health & Safety Website, which specifically purports to provide "The Truth About Worker Health and Safety Amid COVID-19" and offers detailed information about Smithfield's workplace safety practices. The Health & Safety Website remains accessible as of the filing of this Complaint at https://www.smithfieldfoods.com/thetruth/healthsafety.

---

[31] Smithfield *Wash. Post* Advertisement, Aug. 2, 2020, https://www.smithfieldfoods.com/pdf/Smithfield_New%20York%20Times_%20Advertisement.pdf.

58.     On its Health & Safety Website, Smithfield stridently defends its worker safety record, representing to consumers that the "accusation that we have been unwilling to implement worker protections for the sake of profits is patently and demonstrably false" and that the company has "done everything possible to protect employee health and safety." The Health & Safety Website also describes Smithfield's purported workplace safety practices in extensive detail.[32]

59.     Finally, in June 2021, Smithfield published its 2020 Sustainability Report ("Sustainability Report"). The Sustainability Report includes a section dedicated to "Worker Health and Safety" and includes detailed disclosures about the company's response to COVID-19 and its workplaces safety protocols.[33]

60.     Together, Smithfield's repeated, detailed, and fulsome assertions disseminated to consumers through multiple media create the impression that its workplace safety protocols are more than adequate. But while these representations may have protected Smithfield's brand and reassured uneasy consumers, they were deceptive and misleading. In fact, the company's frontline workers did not receive the full measure of protections that Smithfield advertised.

61.     As an initial matter, Smithfield's aggressive defense of its workplace safety practices is belied by the company's COVID-19 record, which paints a starkly different picture. While public reporting on COVID-19 outbreaks at Smithfield plants is largely limited to the early stages of the pandemic, even this narrow window reveals a company case count numbering well into the thousands of workers. These outbreaks—which also include one major outbreak as recently as January 2021—include, but are not limited to:

---

[32] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[33] Smithfield, Sustainability Report, https://sustainability.smithfieldfoods.com/getmedia/8abeb529-091a-4076-86f2-f0ef0f66a08c/2020_Smithfield_Sustainability_Impact_Report.pdf.

- **Sioux Falls, SD**. 1,294 employees tested positive and four died at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[34]

- **Vernon, CA**. 784 employees tested positive and five died at a Farmer John meat processing plant (a Smithfield-owned subsidiary) in an outbreak beginning in April 2020 and with new cases continuing to be reported through January 2021.[35]

- **Crete, NE**. 333 employees tested positive and one died at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[36]

- **Tar Heel, NC**. 281 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[37]

- **Monmouth, IL**. 188 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to September 2020.[38]

- **Clinton, NC**. 170 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[39]

- **Cudahy, WI**. 105 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[40]

- **Milan, MO**. 77 employees tested positive at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[41]

---

[34] Kimberly Kindy, *More than 200 meat plant workers in the U.S. have died of covid-19*, Wash. Post (Sept. 13, 2020), https://www.washingtonpost.com/national/osha-covid-meat-plant-fines/2020/09/13/1dca3e14-f395-11ea-bc45-e5d48ab44b9f_story.html.

[35] Leah Douglas & Georgia Gee, *A COVID outbreak at a California meatpacking plant started a year ago—and never went away*, Mother Jones (Mar. 16, 2021), https://www.motherjones.com/food/2021/03/a-covid-outbreak-at-a-california-meatpacking-plant-started-a-year-ago-and-never-went-away/.

[36] Leah Douglas, *Mapping Covid-19 outbreaks in the food system*, Food & Env. Reporting Network (Apr. 22, 2020), https://thefern.org/2020/04/mapping-covid-19-in-meat-and-food-processing-plants/.

[37] *Id.*

[38] Jane Carlson, *Data: Monmouth Smithfield plant had 188 cases*, Galesburg Reg. Mail (Oct. 13, 2020), https://www.galesburg.com/story/news/coronavirus/2020/10/13/data-monmouth-smithfield-plant-had-188-cases/114314146/.

[39] Douglas, *Mapping Covid-19, supra* note 36.

[40] *Id.*

[41] Madison McVan, *COVID-19 outbreak at Smithfield Foods meatpacking plant in Missouri likely larger than originally known, OSHA documents say*, Investigate Midwest (May 10, 2021), https://investigatemidwest.org/2021/05/10/covid-19-outbreak-at-smithfield-foods-meatpacking-plant-in-missouri-likely-larger-than-originally-known-osha-documents-say/.

- **St. Charles, IL**. 64 employees tested positive and three died at a Smithfield pork processing plant in an outbreak spanning April to May 2020.[42]

62.    In addition to this stark data, Smithfield's workplace safety representations are also contradicted by a variety of sources, including the company's own policies, records made by government regulators, and worker accounts.

> i.    **Smithfield's representations regarding its PPE policies and protocols are misleading.**

63.    Smithfield has made PPE—and specifically, the provision of protective masks—a consistent refrain in its messaging to consumers. For example (all emphases added):

a.    The Response Website (posted no later than April 25, 2020) represented that Smithfield had "Boosted personal protective equipment, <u>including masks</u>."[43]

b.    The PPE Website (posted no later than May 1, 2020) represents: "<u>Every employee involved</u> in the handling, preparing and processing of food wears personal protective equipment covering their heads, faces (including masks and face shields), hands and bodies."[44]

c.    The Health & Safety Website (posted in approximately September 2020) represents that Smithfield has spent "tens of millions of dollars on personal protective equipment (PPE) to include millions of masks and face shields to outfit every single team member," which was done as "<u>quickly as CDC guidance was issued</u> and supplies became available."[45]

64.    However, Smithfield's actual workplace safety record contradicts these representations. The facts show that Smithfield had repeated lapses in providing workers with protective masks well after the company made these representations and CDC updated its guidance to recommend face coverings in public settings on April 3, 2020.[46]

---

[42] Douglas, *Mapping Covid-19, supra* note 36.

[43] Smithfield, *Our COVID-19 Response, supra* note 28.

[44] Smithfield, *COVID-19 PPE, supra* note 29.

[45] Smithfield, *Employee Health and Safety Amid COVID-19, supra* note 12.

[46] The CDC first recommended face coverings to the general public on April 3, 2020. *See* Internet Archive, CDC, *Recommendation Regarding the Use of Cloth Face Coverings* (Apr. 3, 2020), http://web.archive.org/web/20200403221424/https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html ("CDC recommends wearing cloth face coverings in public settings where other social

65.     The most recent example involves Smithfield's Vernon, CA plant.[47] There, the California Division of Occupational Safety and Health (Cal/OSHA) issued a citation against Smithfield on November 12, 2020—months after the above representations above were made. The citation penalized Smithfield $58,100 for various workplace safety violations following a six-month investigation. The citation found that Smithfield "failed to implement and maintain an effective Injury and Illness Prevention Program" through its "[f]ailure to provide or ensure the use of face coverings to prevent the release of infectious particles into the air when persons are breathing, speaking, coughing, or sneezing." The citation also required Smithfield to abate the violations by December 1, 2020.[48]

66.     Notwithstanding this citation and order to abate, just a few months later in January 2021, the Vernon plant reported over 300 COVID-19 cases.[49]

67.     Similar lapses were reported at Smithfield's meatpacking plant in Sioux Falls, SD. There, in early March, union representatives requested a suite of protective measures— including protective masks—from Smithfield management.[50] However, management dragged its feet and by the time the virus was spreading through the plant in early April, employees repeatedly reported being unable to access protective masks.[51] Indeed, even when the company finally did provide workers with face coverings, they were thin and flimsy; pictures sent by

---

distancing measures are difficult to maintain (e.g., grocery stores and pharmacies) especially in areas of significant community-based transmission.").

[47] Douglas & Gee, *supra* note 35.

[48] Cal/OSHA Citation and Notification of Penalty to Smithfield Foods, Inc. (Nov. 12, 2020), https://www.dir.ca.gov/dosh/coronavirus/citations/11.12.2020_Smithfield-Foods_Inc_1476723.pdf.

[49] Douglas & Gee, *supra* note 35.

[50] Jessica Lussenhop, *Coronavirus at Smithfield pork plant: The untold story of America's biggest outbreak*, BBC (Apr. 17, 2020), https://www.bbc.com/news/world-us-canada-52311877.

[51] *E.g., id.*; Lee Fang, *Employees say Smithfield plant in Wisconsin concealed Covid-19 infections*, The Intercept (Apr. 19, 2020), https://theintercept.com/2020/04/19/smithfield-foods-wisconsin-coronavirus/.

workers to local newspaper *The Argus Leader* showed coverings that resembled a hairnet

(pictured below)—far less protective than a surgical mask or even one made of cloth.[52]



68.    Ultimately, the Occupational Safety and Health Administration (OSHA) inspected

the Sioux Falls plant and issued Smithfield a citation in September 2020 for "failing to protect

employees from exposure to the coronavirus."[53] In all, Smithfield's Sioux Falls plant went on to

become one of the largest workplace COVID-19 outbreaks over the course of the pandemic, with

1,294 cases and four employees dying from the disease.

69.    Finally, in addition to these formal citations, worker accounts from other

Smithfield plants across the country detail similar PPE lapses. At a Smithfield plant in Cudahy,

WI, workers reported in April 2020 that their attempts to bring their own masks were met with

reprimands by Smithfield's human resources department and threats of suspension.[54] Another

Smithfield worker at a plant in Tar Heel, NC similarly reported to the North Carolina

---

[52] Makenzie Huber, *Smithfield workers asked for safety from COVID-19. Their company offered cash*, Argus Leader (Apr. 9, 2020), https://www.argusleader.com/story/news/2020/04/09/smithfield-foods-workers-criticize-conditions-coronavirus-covid-19/5124387002/.

[53] OSHA Press Release (Sept. 10, 2020), https://www.osha.gov/news/newsreleases/region8/09102020.

[54] Fang, *supra* note 51.

Department of Labor in April 2020 that managers would not allow workers to wear masks.[55] In

addition, at a Smithfield plant in Milan, MO, workers reported a lack of masks entirely

throughout early April.[56]

      **ii.   Smithfield's representations regarding its social distancing policies and protocols are misleading.**

70.     On the issue of social distancing, Smithfield has largely resisted implementing

this protective measure altogether. Smithfield has defended this resistance in its consumer-facing

statements by repeatedly insisting that social distancing is simply not possible on production

lines. For example (all emphases added):

    a.   The PPE Website represents that Smithfield has "installed plexiglass and other physical barriers on the production floor and in break areas. This is especially important in areas where <u>social distancing is not possible like on production lines.</u>" [57]

    b.   The Health & Safety Website represents: "<u>In places where social distancing isn't possible</u> due to the unavoidable constraints of the existing buildings, we have—at substantial expense—constructed temporary or permanent spaces to spread out. If adding space isn't feasible, we have protected our workers by installing thousands of physical barriers to help prevent the spread of the virus." [58]

    c.   The Sustainability Report represents: "Because <u>physical distancing is not possible</u> in all areas of a meat-processing facility, we purchased plexiglass and other physical barriers to protect our workers."[59]

71.     However, this blanket assertion of impossibility is not supported by the facts.

Most notably, the CDC itself directly provided Smithfield with an explanation of how social

---

[55] NC Watchdog Reporting Network, *As COVID-19 spread in NC meatpacking plants, workplace complaints piled up*, News & Observer (July 28, 2020), https://www.newsobserver.com/news/coronavirus/article244545857.html.

[56] Madison McVan, *Milan meat processing plant workers cite unsafe COVID conditions*, Columbia Missourian (Apr. 16, 2020), https://www.columbiamissourian.com/news/covid19/milan-meat-processing-plant-workers-cite-unsafe-covid-conditions/article_b2c655f4-7f2b-11ea-85e8-fb32c440c477.html.

[57] Smithfield, *COVID-19 PPE*, *supra* note 29.

[58] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[59] Sustainability Report, *supra* note 33, at 62.

distancing could be achieved on its production lines. Following the explosive outbreak at Smithfield's Sioux Falls plant, the South Dakota Department of Health requested CDC "assistance in developing strategies to help reduce SARS-CoV-2 infections among Smithfield Foods Sioux Falls pork processing plant employees."[60] The CDC conducted an evaluation and issued an April 22, 2020 memorandum, cc'ing Smithfield executives, that contained recommendations to protect against viral spread. In that memorandum, the CDC expressly recommended that social distancing practices could be implemented with corresponding changes in the company's production practices, namely reducing line speeds:

> Staggering employees along line workstations so that employees are not working directly across from each other. <u>Changes in production practices (e.g., line speed reductions) may be necessary in order to maintain appropriate distancing among employees.</u>[61]

72.    Occupational health and safety experts also refute Smithfield's claims. For example, Deborah Berkowitz, formerly the Chief of Staff at OSHA and now the Director of the Worker Health and Safety Program at the National Employment Law Project, questioned this claim in sworn congressional testimony. In a March 2, 2021 hearing before the United States House of Representatives regarding the Health and Safety Protections for Meatpacking, Poultry and Agricultural Workers, Ms. Berkowitz reiterated that the "number one" protective measure of social distancing could be implemented with corresponding "changes in production practices."[62]

---

[60] CDC Memo re: Strategies to reduce COVID-19 transmission at the Smithfield Foods Sioux Falls Pork Plant at 1 (Apr. 22, 2020), https://covid.sd.gov/docs/smithfield_recs.pdf.

[61] *Id.* at 7.

[62] Testimony of Deborah Berkowitz, National Employment Law Project, Hr'g before U.S. House of Representatives re *Health & Safety Protections for Meatpacking, Poultry, and Agricultural Workers* 7-9 (Mar. 2, 2021), http://stage.nelp.org/wp-content/uploads/Testimony-of-Debbie-Berkowitz-NELP-Before-House-Subcommittee-on-Labor-HHS-Ed-and-related-agencies.pdf.

73.     Altogether, Smithfield's representations that social distancing on its production lines was categorically "not possible" misled consumers regarding the company's working conditions. These statements were deceptive because they amounted to gross oversimplifications, eliding obvious measures the company could have adopted had it been willing to tolerate changes to its production methods. These statements also provided Smithfield with a false justification to maintain the status quo, preserving its pre-pandemic business operations at the drastic expense of worker safety.

### iii.  Smithfield's representations regarding its attendance and leave policies are misleading.

74.     Smithfield has also made numerous representations that it has maintained lenient attendance and leave policies during the pandemic to protect its workers. For example (all emphases added):

a.  The Response Website represented that Smithfield had "[r]elaxed attendance policies to eliminate any punitive effect for missing work due to COVID-19" and "[e]xplicitly instruct[ed] employees not to report to work if they are sick or exhibiting COVID-19 symptoms."[63]

b.  The Advertisements represented that Smithfield was "implementing aggressive measure to protect [employees'] health and safety" and "rewarding our team members on the frontline."[64]

c.  The Health & Safety Website represents that Smithfield has "put in place liberal leave and pay policies that have guaranteed pay for nearly 13,000 employees who were quarantined, but did not test positive for COVID-19, or were otherwise unable to attain 40 hours of work in a week."[65]

d.  The Health & Safety Website also represents that Smithfield has "absolutely no motivation—in fact, we are disincentivized—to have sick team members reporting to work."[66]

---

[63] Smithfield, *Our COVID-19 Response*, *supra* note 28.

[64] Smithfield *Wash. Post* Advertisement, Aug. 2, 2020, *supra* note 31.

[65] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[66] *Id.*

e.  The Sustainability Report represents that: "We also adjusted our attendance policies and leave benefits to help ensure sick workers did not enter our plants and to support employees in a rapidly changing and uncertain time."[67]

75.    However, these representations to consumers about lenient attendance and leave policies are contradicted by Smithfield's actual policies throughout the pandemic.

76.    One systemic example is Smithfield's punitive attendance policy, which prior to the pandemic assessed employees with punitive "points" for missing work. These points accrued over time, and yielded various disciplinary consequences, including termination. As early as April 25, 2020, Smithfield represented to consumers in its Response Website that it "[r]elaxed" this policy to "eliminate any punitive effect for missing work due to COVID-19."[68]

77.    The situation on the ground, though, was much different. Workers at a Smithfield plant in Milan, MO, reported being assigned points even when they took leave due to COVID-19 symptoms;[69] on information and belief, other workers reported being assigned points after being instructed to wait at home pending their COVID-19 test results.

78.    This was because Smithfield policies were not what they represented to the public. Far from flatly eliminating "any punitive effect for missing work due to COVID-19," Smithfield imposed stringent requirements that workers had to meet to avoid being penalized for missing work.[70] For example, at the Milan plant, displaying COVID-19 symptoms alone was not enough to stay at home and avoid points. Rather, to avoid being assigned points, such workers needed to obtain an order from Smithfield or a doctor to stay at home. [71]

---

[67] Sustainability Report, *supra* note 33, at 61.

[68] Smithfield, *Our COVID-19 Response*, *supra* note 28.

[69] Compl. at 18, *Doe v. Smithfield Foods, Inc.*, No. 20-06063 (W.D. Mo. 2020).

[70] *Id.*

[71] *Id.*

79.     Similarly, in an early April 2020 set of FAQs provided to a union representing workers at a Smithfield plant in Pennsylvania, Smithfield shifted the burden onto its <u>employees</u> to seek removal of points accrued due to COVID-19-related absences. Points would be automatically removed for employees "placed on a quarantine or anyone currently under a physician's care for a diagnosis of COVID-19," but other affected employees would have to "submit to HR a written request (including justification for the request) for other absences from work related to COVID-19 and ask that they be reviewed and removed." The FAQ also stated that this modest relaxation would only be through April 30, 2020, when it would be "re-evaluated . . . to determine if the standard should be continued."[72]

80.     Smithfield's representations that it had "absolutely no motivation" to encourage sick employees to report to work are also contradicted by the company's response to the pandemic. Most egregiously, in early April 2020, the virus was spreading quickly through multiple Smithfield slaughterhouses. But rather than halt operations, Smithfield chose to offer its employees a $500 "responsibility bonus" for workers who completed all their shifts through the end of the month. This bonus incentivized and pressured workers to continue reporting to work even if they were sick. The bonus was widely rolled out across multiple Smithfield plants, including those in Milan and Sioux Falls—worksites that would go on to experience outbreaks significant outbreaks.

81.     Worker accounts from other Smithfield plants also repeatedly contradict the company's representations that it does not pressure employees to work while sick. Numerous workers at Smithfield's Sioux Falls plant reported pressure to work while sick, with one worker

---

[72] Smithfield FAQ distributed to UFCW 1776, https://www.ufcw1776.org/covid/EmployerDocuments/04-April%202020/20200403/20200403%20Smithfield%20Combine.pdf.

exhibiting fever symptoms reporting that a supervisor instructed him to report to work and not tell anyone else about his fever.[73]

82.     Workers at a Smithfield distribution center in Greenfield, IN likewise reported that management permitted workers with fevers to complete their shifts after "cooling off" outside or in front of air conditioners, and that supervisors communicated to workers they were "lucky" to work in refrigerated conditions, claiming the virus could not survive the cold.[74]

### iv. Smithfield's representations regarding its cooperation with state and local health authorities are misleading.

83.     Smithfield has also made several representations regarding its cooperation with state and local health authorities.

   a. The Health & Safety Website represents: "Throughout the pandemic, we have partnered with our local and state health departments to help ensure COVID-19 cases among our employees are completely and accurately reflected at all levels of reporting. This collaborative approach ensures that the data is correctly and transparently disclosed."[75]

   b. The Sustainability Report represents: "We also partnered with local and state health departments to help ensure COVID-19 cases among our employees were completely and accurately reflected at all levels of reporting. This collaborative approach ensured that the data was correctly and transparently disclosed."[76]

84.     Again, Smithfield's actual behavior belies this commitment. Smithfield has consistently acted to subvert and undermine the enforcement efforts of state and local regulators on basic COVID-19 reporting and workplace safety standards.

---

[73] Stephen Groves, *For meat plant workers, virus makes a hard job perilous*, Wash. Times (Apr. 15, 2020), https://www.washingtontimes.com/news/2020/apr/15/for-meat-plant-workers-virus-makes-a-hard-job-peri/.

[74] Taylor Telford & Kimberly Kindly, *As they rushed to maintain U.S. meat supply, big processors saw plants become covid-19 hot spots, worker illnesses spike*, Wash. Post (April 25, 2020), https://www.washingtonpost.com/business/2020/04/25/meat-workers-safety-jbs-smithfield-tyson/.

[75] Smithfield, *Employee Health and Safety Amid COVID-19*, *supra* note 12.

[76] Sustainability Report, *supra* note 33, at 63.

85.     The most recent example of this subversive behavior involves Smithfield's management of its plant in Vernon, CA. Contrary to Smithfield's commitments to transparency, there is substantial evidence that the company has been significantly underreporting the plant's case count and failing to comply with state reporting requirements. Indeed, Cal/OSHA's November 12, 2020 citation charges Smithfield for having "failed to enter 303 recordable COVID-19 illnesses of its own employees and contract employees" on its illness record logs and also having "failed to provide [Cal/OSHA] with access" to those records.[77]

86.     Similar lapses were reported at other Smithfield plants early in the pandemic. At a plant in Cudahy, WI, workers accused Smithfield managers in April 2020 of concealing the number of infections, pressuring employees to avoid quarantine measures, and failing to provide PPE.[78] The plant would go on to report 105 total COVID-19 cases.

87.     At Smithfield's plant in Milan, Missouri, the company declined to provide figures on the scope of the outbreak. A local hospital director reported in late May that there had been 35 cases tied to the plant. OSHA then released a report in September finding that the plant's outbreak in April through May was at least twice as large as originally reported, jumping from 35 cases to 77, and that more than 300 workers were suspected of having the virus or having been in close contact with positive cases.[79]

88.     At another plant in Crawford County, IA, local health officials struggled to reach Smithfield managers altogether. Through increasingly frustrated emails, the county public health director enlisted the support of other local government officials to no avail, concluding in a March 31, 2020 email: "We're likely to have an explosion of cases in Crawford and surrounding

---

[77] Cal/OSHA Citation, *supra* note 48.

[78] Fang, *supra* note 51.

[79] McVan, *COVID-19 outbreak at Smithfield Foods*, *supra* note 41.

counties if we don't get a handle on this. . . . We cannot impact the business if they won't respond to us."[80]

89.    Notably, when Smithfield did choose to engage with government officials, the company acted to undermine public safety efforts. For example, in March 2020, as state governors were scrambling to issue stay-at-home orders to curb the initial spread of the virus, Smithfield's then-CEO Kenneth Sullivan reached out directly to Nebraska Governor Pete Ricketts. In a letter, Mr. Sullivan stated he had "grave concerns" that stay-at-home orders were causing "hysteria" and warned, "We are increasingly at a very high risk that food production employees and others in critical supply chain roles stop showing up for work." Mr. Sullivan also added: "Social distancing is a nicety that makes sense only for people with laptops."[81]

### III.    FWW was injured by Smithfield's conduct.

90.    Throughout the pandemic, FWW has expended significant time and resources investigating and debunking Smithfield's misleading claims on both the meat shortage and workplace safety fronts. FWW has acted to educate its members, consumers, and the general public about Smithfield's misleading statements by publishing numerous investigative articles counteracting the company's representations.

91.    FWW has spent considerable time and resources investigating the truth of Smithfield's claims about meat shortages. For example, between April and November 2020, FWW issued at least 19 Freedom of Information Act (FOIA) requests regarding meat export

---

[80] Michael Grabell & Bernice Yeung, *Meatpacking companies dismissed years of warnings but now say nobody could have prepared for Covid-19*, ProPublica (Aug. 20, 2020), https://www.propublica.org/article/meatpacking-companies-dismissed-years-of-warnings-but-now-say-nobody-could-have-prepared-for-covid-19.

[81] Michael Grabell, Claire Perlman, & Bernice Yeung, *Emails reveal chaos as meatpacking companies fought health agencies over COVID-19 outbreaks in their plants*, ProPublica (June 12, 2020), https://www.propublica.org/article/emails-reveal-chaos-as-meatpacking-companies-fought-health-agencies-over-covid-19-outbreaks-in-their-plants.

certificates in order to compare meatpacking companies' domestic-facing claims with their foreign-facing export practices. FWW has also expended time and resources analyzing and examining publicly available data to investigate the truth of Smithfield's claims.

92.     FWW has also put resources into using the information it obtained from those FOIAs and other investigations to counteract Smithfield's misleading statements, and thereby better inform FWW's members, consumers, and the general public. On April 22, 2020, FWW published an article entitled, "*Fact Checking Smithfield's Coronavirus Food Shortage BS.*"[82] In the article, FWW responded directly to Smithfield's April 12, 2020 press release warning that meat shortages were "perilously close." FWW explained that this claim was "[d]efinitely not" true, and cited data indicating "copious amounts of meat in cold storage around the country" and overproduction "destined for overseas markets" that "could be rerouted to shore up domestic supplies." FWW concluded:

> Corporations like Smithfield routinely choose profit over public health—
> their business model is built on it. Let's be clear: they are pushing to
> prematurely reopen slaughterhouses and other processing facilities because
> their closure threatens the meat industry's profits—NOT our country's food
> supply. And this callousness and greed is causing food workers to die.

93.     On May 26, 2020, FWW published another article counteracting the meat shortage claim. In an article titled, *USDA Spent Memorial Day Weekend Distorting Meat Production*, FWW provided an analysis of USDA export and cold storage data, which indicated meat exports as of May 22, 2020 were "up 36 percent from the prior 4-week average" and cold

---

[82] FWW, *Fact-Checking Smithfield's Coronavirus Food Shortage BS* (Apr. 22, 2020), https://www.foodandwaterwatch.org/2020/04/22/fact-checking-smithfields-bs-about-food-shortages-during-coronavirus-shutdowns/.

storage inventory was "up 2.1% over April 2019 levels." FWW's analysis concluded that the

USDA data "proves industry warnings of impending meat shortages to be false."[83]

94.     FWW also educated consumers on this issue through social media (on Facebook

alone, the organization has over 160,000 followers). For example, on April 23, 2020, FWW

published a Facebook post linking to its *Fact Checking Smithfield's Coronavirus Food Shortage*

*BS* article and specifically refuting Smithfield's representations that a national meat shortage was

"perilously close."[84] On August 25, 2020, FWW published another Facebook post stating,

"Smithfield . . . claimed there was a meat shortage in the U.S. – while exporting products

overseas for a profit. Our consolidated food system is costing consumers and putting workers'

lives at risk. We need change NOW."[85] Screenshots of these Facebook posts are provided below.




[83] FWW, *USDA Spent Memorial Day Weekend Distorting Meat Production* (May 26, 2020), https://www.foodandwaterwatch.org/2020/05/26/usda-spent-memorial-day-weekend-distorting-meat-production/.

[84] FWW, Facebook Post (Apr. 23, 2020), https://www.facebook.com/FoodandWaterWatch/posts/10157371753323031.

[85] FWW, Facebook Post (Aug. 25, 2020), https://www.facebook.com/FoodandWaterWatch/posts/10157721774263031.

95.     FWW also counteracted Smithfield's misleading statements by engaging with media outlets to more broadly communicate the organization's analysis to the general public and consumers. For example, investigative articles published by the *New York Times* and *USA Today* in June 2020 that cast doubt on meat shortage claims both quoted FWW representatives that refuted Smithfield's claims.[86]

96.     On Smithfield's workplace safety representations, FWW has also expended significant resources investigating and debunking these claims. In July 2020, FWW submitted over 15 FOIA requests to health and workplace safety agencies requesting information regarding COVID-19 cases and deaths to investigate how the virus was actually impacting meatpacking facilities.[87] This investigative effort was in response to meatpacking companies' (including Smithfield's) lack of transparency regarding COVID-19 case counts.

97.     FWW has also engaged in a robust public education campaign to inform consumers and the general public about the health and safety dangers faced by meatpacking workers—including Smithfield workers, specifically. As part of this campaign, FWW has expressly counteracted specific Smithfield misrepresentations and sought to educate consumers and the public about workplace safety conditions at Smithfield slaughterhouses.

98.     For example, in an August 4, 2020 Facebook post,[88] FWW directly refuted Smithfield's August 2 full-page Advertisement published in the *Washington Post* that featured a picture of a masked worker and defended the company's workplace safety record. FWW's Facebook post refuted Smithfield's defense, pointing out that "workers are dying and getting sick

---

[86] Bagenstose, *supra* note 16; Corkery & Yaffe-Bellany, *supra* note 17.

[87] FWW's FOIA requests sought information relating to meatpacking facilities in states including Arkansas, Colorado, Delaware, Kansas, Maryland, Nebraska, North Carolina, Virginia, and Wisconsin.

[88] FWW, Facebook Post (Aug. 4, 2020), https://www.facebook.com/FoodandWaterWatch/photos/a.92879533030/10157670916358031/.

in alarming numbers – with little to no protection from Smithfield." A screenshot of this Facebook post is provided below.



99.     FWW also repeatedly sought to educate consumers and the public about Smithfield's workplace safety failures. In an April 22, 2020 article, FWW shed light on how meatpacking facilities were "already notoriously dangerous workplaces" that were made increasingly hazardous by the pandemic. The article pointed out multiple specific lapses in Smithfield's workplace safety practices, observing that workers reported a "work while sick" culture; that Smithfield "offer[ed] workers in some plants a $500 'responsibility bonus'" for not missing work in the early weeks of the pandemic; and that the company did not take adequate measures to appropriately distance workers.[89]

100.     FWW's educational efforts took many additional forms. For example, in April 2020, FWW's Executive Director was interviewed by *Democracy Now* regarding safety failures at Smithfield's Sioux Falls plant, where she commented on the company's lack of concern for worker safety and failure to adequately distance workers in the facility.[90] FWW also leveraged

---

[89] FWW, *Fact-Checking Smithfield's Coronavirus Food Shortage BS* (Apr. 22, 2020), https://www.foodandwaterwatch.org/2020/04/22/fact-checking-smithfields-bs-about-food-shortages-during-coronavirus-shutdowns/.

[90] *'Terrified to Go to Work': Hundreds of Workers in Meat & Poultry Plants Test Positive for COVID-19*, Democracy Now Interview with W. Hauter (Apr. 14, 2020), https://www.democracynow.org/2020/4/14/us_meatpacking_facilities_coronavirus.

social media in its outreach efforts, criticizing Smithfield's failures to provide workers with masks and adequate social distancing in posts published on June 14 and June 28, 2020.[91]

101.    FWW also sought to educate consumers and the general public by amplifying the direct accounts of Smithfield workers. On June 4, 2020, FWW hosted a public webinar on *Workers, Food Safety, and the Global Pandemic*. The panel featured a workers' rights advocate who represented Smithfield workers at a plant in Milan, MO, who shared the struggle of Smithfield workers to get basic protective equipment and other safety measures implemented at the facility.[92]

102.    Finally, FWW's efforts on the workplace safety front have also included spearheading grassroots efforts to prevent dangerous increases in line speeds during the pandemic[93] that would endanger Smithfield workers and demanding state-issued emergency safety standards to better protect meatpacking workers from COVID-19 in the face of company inaction.[94]

103.    Smithfield's misrepresentations are ongoing. For example, in addition to the Sustainability Report published this June, the COVID Website, Health & Safety Website, and the PPE Website all remain online as of the filing of this Complaint. Smithfield has also failed to retract misrepresentations in the Advertisement and in the Response Website. These ongoing

---

[91] FWW Facebook Post (June 14, 2020), https://www.facebook.com/FoodandWaterWatch/posts/ 10157528924323031; FWW Facebook Post (June 28, 2020), https://www.facebook.com/FoodandWaterWatch/ posts/10157568807458031.

[92] FWW Webinar, *Workers, Food Safety, and the Global Pandemic* (Jun. 4, 2020), https://www.facebook.com/FoodandWaterWatch/videos/568184237406169/.

[93] FWW, Demand Congress stop allowing USDA food safety waivers, https://secure.foodandwaterwatch.org/act/demand-congress-stop-allowing-usda-food-safety- waivers?ms=fwws_ot_03082021_issues-page&oms=fwws_ot_03082021_issues-page.

[94] Groups urge Maryland Gov. Hogan to issue emergency safety standard to protect workers from COVID-19, National Employment Law Project (Aug. 26, 2020), https://www.nelp.org/news-releases/groups-petition-governor- hogan-issue-emergency-safety-standard-protect-workers-covid-19/.

misrepresentations frustrate FWW's mission of increasing transparency in the industrial livestock production system and holding agribusiness corporations accountable for the harms they inflict on local communities and workers.

104.    In addition, because Smithfield's misrepresentations are ongoing, FWW will continue to divert staff time and resources away from its core factory farm work to further investigate and counteract the company's claims, including through additional FOIA inquiries and public messaging efforts.

105.    If this lawsuit fails to correct Smithfield's misrepresentations, this will put greater pressure on FWW to expend additional resources correcting the company's misrepresentations and counteracting the company's claims.

## COUNT I: VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT

106.    FWW incorporates the foregoing allegations into this Count.

107.    The CPPA is a remedial statute that is to be liberally construed. It establishes an enforceable right to truthful information from merchants about consumer goods that are or would be purchased or received in the District of Columbia.

108.    Smithfield is a "person" and a "merchant" under the CPPA because it is a corporation that supplies consumer goods—pork meat products—in the ordinary course of its business throughout the District. *See* D.C. Code § 28-3901(a)(1), (a)(3).

109.    The CPPA prohibits unfair and deceptive trade practices in connection with the sale and supply of consumer goods, "whether or not any consumer is in fact misled, deceived, or damaged thereby[.]" D.C. Code § 28-3904.

110.    Smithfield has violated the CPPA by engaging in the following unfair and deceptive trade practices:

a. Smithfield's representations to District consumers, both express and implied, about the imminence of widespread meat shortages, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, misrepresented the quantity of Smithfield's goods in violation of D.C. Code § 28-3904(a);

b. Smithfield's representations to District consumers, both express and implied, about the imminence of widespread meat shortages, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, are misrepresentations concerning material facts that have a tendency to mislead consumers in violation of D.C. Code § 28-3904(e);

c. Smithfield's representations to District consumers, both express and implied, about the imminence of widespread meat shortages, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, used ambiguities concerning material facts that have a tendency to mislead consumers in violation of D.C. Code § 28-3904(f-1);

d. Smithfield's representations to District consumers, both express and implied, about the imminence of widespread meat shortages, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, advertised goods without the intent to sell them as advertised in violation of D.C. Code § 28-3904(h);

e. Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, misrepresented the characteristics of Smithfield's goods in violation of D.C. Code § 28-3904(a);

f. Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, misrepresented the standard and quality by which Smithfield produced its goods in violation of D.C. Code § 28-3904(d);

g. Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, are misrepresentations concerning material facts that have a tendency to mislead consumers in violation of D.C. Code § 28-3904(e);

h. Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, used ambiguities concerning material facts that have a tendency to mislead consumers in violation of D.C. Code § 28-3904(f-1); and

i. Smithfield's representations to District consumers, both express and implied, regarding its workplace safety protocols, as communicated through its press releases, social media posts, website representations, and advertisements published in the *Washington Post* and *New York Times*, advertised goods without the intent to sell them as advertised in violation of D.C. Code § 28-3904(h).

111.    Smithfield's violations of the CPPA were outrageous and egregious because the company willfully disregarded consumers' rights to truthful information on matters of great significance during a global health crisis.

112.    FWW is a "person," a "non-profit organization," and a "public interest organization" within the meaning of D.C. Code §§ 28-3901(1), (14), and (15).

113.    The CPPA authorizes non-profit organizations to "seek[] relief from the use of a trade practice in violation of a law of the District" and confers standing on such organizations that can demonstrate injury to the organization ("organizational standing"). D.C. Code § 28-3905(k)(1)(C) ("A nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District . . . .") (emphasis added).

114.    FWW has organizational standing pursuant to D.C. Code § 28-3905(k)(1)(C) because Smithfield's misrepresentations have perceptively impaired FWW's existing programs that advocate for increased safety and sustainability in the food system. FWW has also expended significant and increased resources to counteract Smithfield's misleading statements by investigating these statements and correcting these statements in educational outreach to consumers and the general public. Because Smithfield's representations are ongoing, FWW will

have to continue diverting staff time and resources away from its core factory farm work to further investigate and counteract Smithfield's claims.

115.    The CPPA also authorizes public interest organizations to "seek[] relief from the use by any person of a trade practice in violation of a law of the District" and confers standing on organizations that have a "sufficient nexus to the interests involved of the consumer . . . to adequately represent those interests" ("public interest standing"). D.C. Code § 28-3905(k)(1)(D).

116.    FWW has public interest standing pursuant to D.C. Code § 28-3905(k)(1)(D) because it advances the rights and interests of consumers by educating them on the environmental, public health, and workers' rights problems endemic to the food system, and advocates for policies that hold the industrial livestock industry accountable for its polluting and exploitative practices. Moreover, FWW has consistently sought to educate consumers on both these issues by contemporaneously and directly countering Smithfield's false statements issued throughout the course of the COVID-19 public health crisis. These advocacy efforts establish a direct—and more than sufficient—nexus to consumer interests such that FWW can adequately represent those interests.

117.    FWW brings this action on behalf of itself in its organizational capacity, as well as on behalf of the general public and interests of District consumers.

118.    FWW brings this action seeking the relief authorized under D.C. Code 28-3905(k)(2), including:

    a.  Injunctive relief, D.C. Code 28-3905(k)(2)(D);

    b.  Statutory damages of $1,500, D.C. Code 28-3905(k)(2)(A)(i);

    c.  Punitive damages, D.C. Code 28-3905(k)(2)(C);

    d.  Attorneys' fees and costs, D.C. Code 28-3905(k)(2)(B); and

e.  Any additional relief deemed needed or proper, D.C. Code 28-3905(k)(2)(E)-(F).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Food & Water Watch respectfully requests this Court enter a

judgment in its favor against Defendant Smithfield Foods, Inc. and grant the following relief

pursuant to D.C. Code § 28-3905(k)(2).

a.  a declaration that Smithfield's conduct misled and deceived District consumers in violation of the CPPA;

b.  an order enjoining Smithfield's conduct found to be in violation of the CPPA and requiring Smithfield to engage in corrective advertising to remedy its misrepresentations to District consumers;

c.  an order awarding FWW statutory damages of $1,500;

d.  an order awarding FWW punitive damages in an amount to be proven at trial;

e.  an order granting FWW costs, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law; and

f.  further relief, including equitable relief, as this Court may deem just and proper.

## JURY DEMAND

FWW demands a trial by jury.

Respectfully submitted,

Dated: June 16, 2021

/s/ Randolph T. Chen
Randolph T. Chen [D.C. Bar No. 1032644]
Ellen Noble [D.C. Bar No. 242053]
David S. Muraskin [D.C. Bar No. 1012451]
PUBLIC JUSTICE, PC
1620 L Street NW, Suite 630
Washington, D.C. 20036
Phone: (202) 797-8600
rchen@publicjustice.net
enoble@publicjustice.net
dmuraskin@publicjustice.net

[SIGNATURE BLOCK CONTINUES]

E. Michelle Drake [MN Bar No. 387366]*
Joseph C. Hashmall [MN Bar No. 392610]*
BERGER MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
emdrake@bm.net
jhashmall@bm.net

David Seligman [CO Bar No. 49394]*
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Phone: (720) 441-2236
david@towardsjustice.org

Tarah Heinzen [D.C. Bar No. 1019829]
Emily Miller [CA Bar No. 336417]*
FOOD & WATER WATCH
1616 P St. NW, Suite 300
Washington, D.C. 20036
Phone: (202) 683-2500
theinzen@fwwatch.org
eamiller@fwwatch.org

*Application for admission
*pro hac vice* forthcoming

*Counsel for Plaintiff Food & Water Watch*

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Food & Water Watch
_____

vs

Smithfield Foods, Inc.
_____

Case Number: __**2021 CA 002020 B**__

Date: __June 16, 2021__

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* <br> Randolph T. Chen | Relationship to Lawsuit |
| Firm Name: <br> Public Justice, PC | ☒ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.: <br> (202) 797-8600        1032644 | ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE:   ☐ Non-Jury      ☐ 6 Person Jury      ☒ 12 Person Jury

Demand: $__Statutory and Punitive Damages;__   Other: __Injunctive Relief__
              Attorneys' Fees and Costs

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

**NATURE OF SUIT:**      *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☐ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent    ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation                ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                Over $25,000 Pltf. Grants Consent         Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation                ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees           Under $25,000 Pltf. Grants Consent        Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                      Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile             ☐ 03 Destruction of Private Property    ☐ 05 Trespass
☐ 02 Conversion             ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process            ☐ 10 Invasion of Privacy            ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 11 Libel and Slander                   Not Malpractice)
☐ 03 Assault and Battery         ☐ 12 Malicious Interference         ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution          ☐ 19 Wrongful Eviction
☒ 05 Deceit (Misrepresentation)  ☐ 14 Malpractice Legal              ☐ 20 Friendly Suit
☐ 06 False Accusation            ☐ 15 Malpractice Medical (Including Wrongful Death) ☐ 21 Asbestos
☐ 07 False Arrest                ☐ 16 Negligence- (Not Automobile,   ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                            Not Malpractice)               ☐ 23 Tobacco
                                                                     ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D. REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_/s/ Randolph T. Chen_

Attorney's Signature

June 16, 2021

Date

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Food & Water Watch
_____
                                    Plaintiff

vs.

                                                        Case Number    **2021 CA 002020 B**
Smithfield Foods, Inc.
_____
                                    Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Randolph T. Chen
_____
Name of Plaintiff's Attorney

Public Justice, PC                                        By _____
Address                                                                              Deputy Clerk
1620 L St. NW, S- 630, Washington, DC 20036

(202) - 797 - 8600                                      Date    **06/21/2021**
Telephone

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시요    የአማርኛ ትርጉም አማካሪ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                              Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

Food & Water Watch
_____
                                    Demandante

              contra

                                                        Número de Caso: ..................................

Smithfield Foods, Inc.
_____
                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Randolph T. Chen
_____          *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

Public Justice, PC
_____          Por: _____
Dirección                                                              Subsecretario
1620 L St. NW, S- 630, Washington, DC 20036
_____

(202)- 797- 8600
_____          Fecha _____
Teléfono

如需翻译，请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

만약 번역을 원하시면 (202) 879-4828 로 전화 주십시오.          需要翻譯，請打電話 (202) 879-4828          የአማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                        Super. Ct. Civ. R. 4

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

FOOD & WATER WATCH
   Vs.                                             C.A. No.       2021 CA 002020 B
SMITHFIELD FOODS, INC.

## INITIAL ORDER AND ADDENDUM

**Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby** ORDERED **as follows:**

(1) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

**Chief Judge Anita M. Josey-Herring**

Case Assigned to: Judge HEIDI M PASICHOW
Date:      June 21, 2021
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, September 17, 2021
Location:   Courtroom 516
              500 Indiana Avenue N.W.
              WASHINGTON, DC 20001

                CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,   "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.   The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.   Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

CAIO-60

**Civil Remote Hearing Instructions for Participants**

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**


**Option1:** **(AUDIO ONLY/Dial-in by Phone):**

Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.

※ *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise. If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the Audio Alternative

**Option 2: (LAPTOP/ DESKTOP USERS 1):**

Open Web Browser in Google Chrome and copy and paste following address from the next page:
https://dccourts.webex.com/meet/XXXXXXXXX


**Option 3: (LAPTOP/ DESKTOP USERS 2):**

Open Web Browser in Google Chrome and copy and paste following address
https://dccourts.webex.com  Select **Join**, enter the Meeting ID from the next page


AUDIO ALTERNATIVE**:**  Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window.  Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video.



**Option 4: (Ipad/SMART PHONE/TABLET):**

- Go to App Store, Download WebEx App (Cisco WebEx Meetings)
- Sign into the App with your Name and Email Address
- Select Join Meeting
- Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
- Click join and make sure your microphone is muted and your video is unmuted (if you need to be
- seen). If you only need to speak and do not need to be seen, use the audio only option.
- When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #2**

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726 (toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom. Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | **WebEx Direct URL** | **WebEx Meeting ID** |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

CAIO-60

| 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|---|---|---|---|
| 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
| 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
| 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
| 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
| 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
| JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
| A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
| B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
| B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
| B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
| B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |

CAIO-60

Filed
D.C. Superior Court
06/23/2021 13:29PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **FOOD & WATER WATCH**, | |
| Plaintiff, | Case No.: 2021 CA 002020 B |
| | Judge Heidi M. Pasichow |
| v. | Next Event: Initial Scheduling Conference |
| | Date: Sept. 17, 2021 |
| **SMITHFIELD FOODS, INC.,** | |
| Defendant. | |

## PRAECIPE REGARDING RULE 7.1 DISCLOSURE STATEMENT

I, the undersigned, counsel of record for Plaintiff Food & Water Watch (FWW), certify

pursuant to Superior Court Rule of Civil Procedure 7.1(a) that FWW has no parent corporation

and no publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 7.1(a), this filing includes two copies of this Praecipe.

Respectfully submitted,

Dated: June 22, 2021
/s/ Randolph T. Chen
Randolph T. Chen [D.C. Bar No. 1032644]
Ellen Noble [D.C. Bar No. 242053]
David S. Muraskin [D.C. Bar No. 1012451]
PUBLIC JUSTICE, PC
1620 L Street NW, Suite 630
Washington, D.C. 20036
Phone: (202) 797-8600
rchen@publicjustice.net
enoble@publicjustice.net
dmuraskin@publicjustice.net

[SIGNATURE BLOCK CONTINUES]

E. Michelle Drake [MN Bar No. 387366]*
Joseph C. Hashmall [MN Bar No. 392610]*
BERGER MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
emdrake@bm.net
jhashmall@bm.net

David Seligman [CO Bar No. 49394]*
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Phone: (720) 441-2236
david@towardsjustice.org

Tarah Heinzen [D.C. Bar No. 1019829]
Emily Miller [CA Bar No. 336417]*
FOOD & WATER WATCH
1616 P St. NW, Suite 300
Washington, D.C. 20036
Phone: (202) 683-2500
theinzen@fwwatch.org
eamiller@fwwatch.org

*Application for admission
*pro hac vice* forthcoming

*Counsel for Plaintiff Food & Water Watch*

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **FOOD & WATER WATCH**, | |
| Plaintiff, | Case No.: 2021 CA 002020 B |
| | Judge Heidi M. Pasichow |
| v. | Next Event: Initial Scheduling Conference |
| | Date: Sept. 17, 2021 |
| **SMITHFIELD FOODS, INC.,** | |
| Defendant. | |

**PRAECIPE REGARDING RULE 7.1 DISCLOSURE STATEMENT**

I, the undersigned, counsel of record for Plaintiff Food & Water Watch (FWW), certify

pursuant to Superior Court Rule of Civil Procedure 7.1(a) that FWW has no parent corporation

and no publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 7.1(a), this filing includes two copies of this Praecipe.

Respectfully submitted,

Dated: June 22, 2021

/s/ Randolph T. Chen
Randolph T. Chen [D.C. Bar No. 1032644]
Ellen Noble [D.C. Bar No. 242053]
David S. Muraskin [D.C. Bar No. 1012451]
PUBLIC JUSTICE, PC
1620 L Street NW, Suite 630
Washington, D.C. 20036
Phone: (202) 797-8600
rchen@publicjustice.net
enoble@publicjustice.net
dmuraskin@publicjustice.net

[SIGNATURE BLOCK CONTINUES]

E. Michelle Drake [MN Bar No. 387366]*
Joseph C. Hashmall [MN Bar No. 392610]*
BERGER MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
emdrake@bm.net
jhashmall@bm.net

David Seligman [CO Bar No. 49394]*
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Phone: (720) 441-2236
david@towardsjustice.org

Tarah Heinzen [D.C. Bar No. 1019829]
Emily Miller [CA Bar No. 336417]*
FOOD & WATER WATCH
1616 P St. NW, Suite 300
Washington, D.C. 20036
Phone: (202) 683-2500
theinzen@fwwatch.org
eamiller@fwwatch.org

*Application for admission
*pro hac vice* forthcoming

*Counsel for Plaintiff Food & Water Watch*

Filed
D.C. Superior Court
07/13/2021 17:26PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **FOOD & WATER WATCH**, | |
| Plaintiff, | |
| v. | Case No.: 2021 CA 002020 B |
| **SMITHFIELD FOODS, INC.** | |
| Defendant. | |

## CLARIFYING PRAECIPE

Please take note of this praecipe seeking to clarify the office address for Emily Miller, attorney for plaintiff Food & Water Watch, *pro hac vice* application forthcoming. The complaint filed June 16, 2021 lists plaintiff's Washington D.C. office as Ms. Miller's address. While Ms. Miller had been using this address because it is the organization's main office, she works remotely from California, where she is admitted and an active member in good standing of the California bar. Ms. Miller has concluded it is therefore more appropriate for her to use plaintiff's California office, located at 915 Wilshire Blvd, Suite 2125, Los Angeles, CA 90017.

Dated: July 13, 2021

Respectfully submitted,

*/s/ Tarah Heinzen*
Tarah Heinzen [1019829]
Food & Water Watch
1616 P St. NW, Suite 300
Washington, D.C. 20036
(202) 683-2457
theinzen@fwwatch.org

Filed
D.C. Superior Court
07/14/2021 12:25PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **FOOD & WATER WATCH**,<br><br>Plaintiff,<br><br>v.<br><br>**SMITHFIELD FOODS, INC.**,<br><br>Defendant. | Case No.: 2021 CA 002020 B<br>Judge Heidi M. Pasichow<br>Next Event: Initial Conference<br>Sept. 17, 2021 |

## PRAECIPE RE: AFFIDAVIT OF SERVICE

Pursuant to Superior Court Rule of Civil Procedure 4(l), Plaintiff Food & Water Watch submits this praecipe to provide the Court with proof of service of the summons, complaint, and Initial Order on Defendant Smithfield Foods, Inc. (Smithfield).

Service on Smithfield was effectuated by delivery on June 30, 2021 by process server Christopher Hester, whose affidavit is appended as Exhibit A to this praecipe.

Respectfully submitted,

**PUBLIC JUSTICE, PC**

Dated: July 14, 2021

/s/ Randolph T. Chen
Randolph T. Chen [D.C. Bar No. 1032644]
Ellen Noble [D.C. Bar No. 242053]
David S. Muraskin [D.C. Bar No. 1012451]
1620 L Street NW, Suite 630
Washington, D.C. 20036
Phone: (202) 797-8600
rchen@publicjustice.net
enoble@publicjustice.net
dmuraskin@publicjustice.net

**BERGER MONTAGUE PC**

E. Michelle Drake [MN Bar No. 387366]*
Joseph C. Hashmall [MN Bar No. 392610]*
43 S.E. Main Street, Suite 505

Minneapolis, MN 55414
Phone: (612) 594-5999
emdrake@bm.net
jhashmall@bm.net

**TOWARDS JUSTICE**

David Seligman [CO Bar No. 49394]*
1410 High Street, Suite 300
Denver, CO 80218
Phone: (720) 441-2236
david@towardsjustice.org

**FOOD & WATER WATCH**

Tarah Heinzen [D.C. Bar No. 1019829]
1616 P St. NW, Suite 300
Washington, D.C. 20036
Phone: (202) 683-2500
theinzen@fwwatch.org

Emily Miller [CA Bar No. 336417]*
915 Wilshire Blvd., Suite 2125
Los Angeles, CA 90017
Phone: (323) 843-8450
eamiller@fwwatch.org

*Application for admission
*pro hac vice* forthcoming

*Counsel for Plaintiff Food & Water Watch*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on July 14, 2021, I caused a copy of the foregoing Praecipe re: Affidavit of

Service to be served on Defendant Smithfield Foods, Inc. via first-class mail to:

CT Corp. System, Registered Agent
4701 Cox Rd., Suite 285
Glen Allen, VA 23060

*/s/ Randolph T. Chen*
RANDOLPH T. CHEN

*Counsel for Plaintiff Food & Water Watch*

2

# **EXHIBIT A**

STATE OF DISTRICT OF COLUMBIA

SUPERIOR COURT

Food & Water Watch
          Plaintiff,

Court File Number
2021 CA 002020 B

vs.

Smithfield Foods, Inc.
          Defendant,

AFFIDAVIT OF SERVICE

State of Virginia } SS
County of Chesterfield } SS

__Christopher Hester__, being duly sworn, on oath says that on
(Name of Server)

__6 / 30 /2021__ at __11 :45 A__.M, (s)he served the:
(Date of Service)      (Time of Service)

Preservation Letter; Summons; Complaint; Initial Order & Remote Appearance Instructions

upon: Smithfield Foods, Inc.

therein named, personally at:   CT Corporation System
                                4701 Cox Road
                                Suite 285
                                Glen Allen, VA 23060

by handing to and leaving with:

__Julie Parrish__                                    – Service of Process Specialist
(Name of the Person with whom the documents were left)

at CT Corporation System, the Registered Agent for Smithfield Foods, Inc., expressly
authorized to accept service of process for same, a true and correct copy thereof.

Subscribed and Sworn to before me by

__Christopher Hester__
(Printed Name of Process Server)

__7 / 2 /2021.__

__Donna F. Hest__                                    __(Signature of Server)__
(Signature of Notary)

Commonwealth of Virginia
County of Chesterfield
My Commission Expires 11/30/24

*DONNA FAYE HESTER*
*NOTARY PUBLIC*
*MY COMMISSION NUMBER 237446*
*COMMONWEALTH OF VIRGINIA*

---

* Service was completed by an independent contractor retained by Metro Legal Services, Inc.



Serial # BERMO 255008 1149

Re: 20260-04

METRO LEGAL
legal support specialists since 1969

330 2nd Avenue South, Suite 150
Minneapolis, MN 55401
(866) 488-8994
www.metrolegal.com

-1-

Filed
D.C. Superior Court
07/19/2021 18:25PM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| FOOD & WATER WATCH | ) | |
| | ) | |
| Plaintiff, | ) | Judge:  Heidi M. Pasichow |
| | ) | |
| v. | ) | Civil Action No. 2021 CA 002020 B |
| | ) | |
| SMITHFIELD FOODS, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PRAECIPE**

**NOTICE OF APPEARANCE**

 To the Clerk of this Court and all parties of record:

Please enter the appearance of Tiffany H. Riffer of Faegre Drinker Biddle & Reath LLP,

as counsel for Defendant Smithfield Foods, Inc, in the above captioned cased.


Dated:  July 19, 2021                Respectfully submitted,

                         s/Tiffany H. Riffer
                         _____
                         Tiffany H. Riffer (DC Bar No. 1020997)
                         FAEGRE DRINKER BIDDLE & REATH LLP
                         1050 K Street NW, Suite 400
                         Washington, DC 20001
                         Telephone:  202-312-7400
                         Facsimile:  202-312-7461
                         tiffany.riffer@faegredrinker.com

                         **Attorney for Defendant Smithfield Foods, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on July 19, 2021, a copy of the foregoing was filed electronically. Notice of this file will be sent to all parties by operation of the Court's electronic filing system and by first class mail postage prepaid.

**Counsel for Plaintiff Food & Water Watch:**

       Randolf T. Chen
       Ellen Noble
       David S. Muraskin
       PUBLIC JUSTICE, PC
       1620 L Street NW, Suite 630
       Washington, D.C. 20036
       rchen@publicjustice.net
       enoble@publicjustice.net
       dmuraskin@publicjustice.net

                                    s/Tiffany H. Riffer
                                    Tiffany H. Riffer

Filed
D.C. Superior Court
07/19/2021 18:31PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| FOOD & WATER WATCH | ) | |
| | ) | |
| Plaintiff, | ) | Judge: Heidi M. Pasichow |
| | ) | |
| v. | ) | Civil Action No. 2021 CA 002020 B |
| | ) | |
| SMITHFIELD FOODS, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT STIPULATION TO EXTEND TIME TO RESPOND TO COMPLAINT

Pursuant to D.C. Superior Court Rule of Civil Procedure 7-I, the parties, through their undersigned counsel, hereby stipulate and agree to the following: Defendant shall respond to the Complaint by August 4, 2021, and Plaintiff shall oppose any motion to dismiss by September 1, 2021. A proposed order is being filed contemporaneously.

Respectfully submitted this 19th day of July, 2021.

US.133834272.01

**PUBLIC JUSTICE, PC**

**FAEGRE DRINKER BIDDLE & REATH LLP**

By: s/Randolph T. Chen

By: s/Tiffany H. Riffer

    Randolph T. Chen
    Ellen Noble
    David S. Muraskin
    PUBLIC JUSTICE, PC
    1620 L Street NW, Suite 630
    Washington, D.C. 20036
    rchen@publicjustice.net
    enoble@publicjustice.net
    dmuraskin@publicjustice.net

    Tiffany H. Riffer, DC Bar No. 1020997
    tiffany.riffer@faegredrinker.com
    1050 K. Street NW, Suite 400
    Washington, DC 20001, USA
    Telephone:  202-312-7400
    Facsimile:  202-312-7461

    -and-

***Lead Attorneys for Plaintiff Food & Water Watch***

    Sarah Brew (*Pro Hac Vice* forthcoming)
    Tyler A. Young (*Pro Hac Vice* forthcoming)
    sarah.brew@faegredrinker.com
    tyler.young@faegredrinker.com
    2200 Wells Fargo Center, 90 South 7th St.
    Minneapolis, Minnesota 55402, USA

    ***Attorneys for Defendant Smithfield Foods, Inc.***

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | | |
|---|---|---|
| FOOD & WATER WATCH | ) | |
| | ) | |
| Plaintiff, | ) | Judge:  Heidi M. Pasichow |
| | ) | |
| v. | ) | Civil Action No. 2021 CA 002020 B |
| | ) | |
| SMITHFIELD FOODS, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER GRANTING JOINT STIPULATION TO EXTEND TIME**

Upon consideration of the Parties' Joint Stipulation to Extend Time to Respond to

Complaint, it is this ___ day of July, 2021, hereby

ORDERED, that the Request is **GRANTED**; and it is further

ORDERED, that Defendant's time to respond to the Complaint is hereby extended to and

including August 4, 2021; and it is further

ORDERED, that Plaintiff's time to respond to Defendant's motion to dismiss is hereby

extended to and including September 1, 2021.

_____

**Honorable Heidi M. Pasichow**
Associate Judge

1

US.133831212.01

Order to be served upon:

  Tiffany H. Riffer, DC Bar No. 1020997
  Faegre Drinker Biddle & Reath LLP
  tiffany.riffer@faegredrinker.com
  1050 K. Street NW, Suite 400
  Washington, DC 20001, USA
  Telephone:  202-312-7400
  Facsimile:  202-312-7461

  Sarah Brew
  Tyler A. Young
  Faegre Drinker Biddle & Reath LLP
  sarah.brew@faegredrinker.com
  tyler.young@faegredrinker.com
  2200 Wells Fargo Center, 90 South Seventh St.
  Minneapolis, Minnesota 55402, USA

  *Attorneys for Defendant*
  *Smithfield Foods, Inc.*




  Randolph T. Chen
  Ellen Noble
  David S. Muraskin
  PUBLIC JUSTICE, PC
  1620 L Street NW, Suite 630
  Washington, D.C. 20036
  rchen@publicjustice.net
  enoble@publicjustice.net
  dmuraskin@publicjustice.net

  *Attorneys for Plaintiff*
  *Food & Water Watch*

US.133831212.01